IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INTEGRATED CARDS, L.L.C., | ) | |
| | ) | Civil Action No.: 06 C 2071 |
| PLAINTIFF/COUNTER-DEFENDANT, | ) | |
| | ) | The Honorable Virginia M. Kendall |
| V. | ) | |
| | ) | Magistrate Judge Brown |
| MCKILLIP INDUSTRIES, INC. D/B/A | ) | |
| USA/DOCUFINISH, | ) | |
| | ) | |
| DEFENDANT/COUNTER-PLAINTIFF. | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**FOLLOWING BIFURCATED TRIAL OF DEFENDANT'S AFFIRMATIVE DEFENSES**

**OF**

**LACHES AND ESTOPPEL**

DATE:  April 17, 2009

s/Jon A. Birmingham
Jon A. Birmingham
FITCH, EVEN, TABIN & FLANNERY
120 South LaSalle Street, Suite 1600
Chicago, Illinois 60603
Telephone: (312) 577-7000
Facsimile: (312) 577-7007
*Attorney for Integrated Cards, L.L.C.*

## Table of Contents

I.    INTRODUCTION ............................................................................................. 1

II.   BACKGROUND – PROPOSED FINDINGS OF FACT ..................................... 1

   A.   The Patent-In-Suit .................................................................................... 1
   B.   Integrated Card Products ........................................................................... 3

III.  PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING
       ESTOPPEL ....................................................................................................... 3

   A.   Proposed Findings of Fact ......................................................................... 3
      1.   Docufinish Did Not Prove Any "Communication" ........................................ 3
      2.   Docufinish Did Not Prove Any Relevant "Reliance" .................................... 4
      3.   Docufinish Did Not Prove Any Legally Cognizable "Prejudice" .................. 5
   B.   Proposed Conclusions of Law .................................................................... 8
      1.   Docufinish Did Not Prove Any "Communication" ........................................ 8
      2.   Docufinish Did Not Prove Any Relevant "Reliance" .................................... 9
      3.   Docufinish Did Not Prove Any Legally Cognizable Prejudice .................... 11

IV.  PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING
       LACHES ......................................................................................................... 14

   A.   Proposed Findings of Fact ....................................................................... 14
      1.   Docufinish Did Not Prove Any "Delay" ...................................................... 14
      2.   Docufinish Did Not Prove Any Legally Cognizable "Prejudice" ................. 20
   B.   Proposed Conclusions of Law .................................................................. 21
      1.   Docufinish Did Not Prove Any "Delay" ...................................................... 21
      2.   Docufinish Did Not Prove Any Legally Cognizable "Prejudice" ................. 22
      3.   No Presumption of Laches Applies ............................................................... 23
      4.   Docufinish's Attempts at Collateral Impeachment of John J. McKillip Fail .. 23

V.   DOCUFINISH HAS "UNCLEAN HANDS" AND IS NOT ENTITLED TO
       EQUITABLE RELIEF ..................................................................................... 23

VI.  CONCLUSION ............................................................................................... 24

## Table of Authorities

**Cases**

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
   960 F.2d 1020 (Fed. Cir. 1992) ................................................................... passim
*B. Braun Med. Inc. v. Abbott Labs.*,
   124 F.3d 1419 (Fed. Cir. 1997) ...................................................................... 8
*Dimension One Spas, Inc. v. Coverplay, Inc.*,
   No. 03cv1099, 2008 U.S. Dist. LEXIS 69526 (S.D. Cal. Sept. 5, 2008) ............... 13
*Electromotive Div. of General Motors v. Transp. Sys. Div. of General Electric Co.*,
   275 F. Supp. 2d 850 (E.D. Mich. 2003) .............................................................. 9
*Freeman v. Gerber Prods. Co.*,
   466 F. Supp. 2d 1242 (D. Kan. 2006) ................................................................ 13
*Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*,
   60 F.3d 770 (Fed. Cir. 1995) ..................................................................... 10, 24
*Genzyme Corp. v. Atrium Med. Corp.*,
   No. 00-958, 2003 U.S. Dist. LEXIS 12784 (D. Del. July 22, 2003) ................. 11, 12
*Hemstreet v. Computer Entry Sys. Corp.*,
   972 F.2d 1290 (Fed. Cir. 1992) ......................................................... 9, 11, 21, 23
*Intirtool, Ltd. v. Texar Corp.*,
   369 F.3d 1289, (Fed. Cir. 2004) .................................................................... 21
*James River Corp. v. Hallmark Cards, Inc,.*
   915 F. Supp. 968, 983 (E.D. Wis. 1996)............................................. 10, 11, 12, 14
*Meyers v. Asics Corp.*,
   974 F.2d 1304 (Fed. Cir. 1992) ............................................................ 9, 10, 12, 13
*Meyers v. Brooks Shoe*,
   912 F.2d 1459 (Fed. Cir. 1990) .................................................................... 12
*Oakwood Labs., L.L.C. v. TAP Pharm. Prods., Inc.*,
   No. 01C-7631, 2003 U.S. Dist. LEXIS 20353 (N.D. Ill. Nov. 12, 2003)............... 13
*R2 Med. Sys., Inc. v. Katecho, Inc.*,
   931 F. Supp. 1397 (N.D. Ill. 1996) ................................................................... 9
*Rockwell Int'l Corp. v. SDL, Inc.*,
   103 F. Supp. 2d 1192 (N.D. Cal. 2000) ............................................................. 21
*Scholle Corp. v. Blackhawk Molding Co.*,
   133 F.3d 1469 (Fed. Cir. 1998) ....................................................................... 9
*SRI Int'l. v. Advanced Tech. Labs.*,
   127 F.3d 1462 (Fed. Cir. 1997) ..................................................................... 24
*Stryker Corp. v. Zimmer, Inc.*,
   741 F. Supp. 509 (D.N.J. 1990) ....................................................................... 9
*TWM Mfg. v. Dura Corp.*,
   592 F.2d 346, 349 (6th Cir. 1979) .................................................................. 24
*Whitehall Corp. v. Western Geophysical Co.*,
   664 F.Supp. 1056, 1074, (S.D. Tex. 1986) ...................................................... 24

**Statutes**

35 U.S.C. § 286 ........................................................................................................................ 13, 24

## I. Introduction

Plaintiff, Integrated Cards, L.L.C. ("Integrated Cards"), submits the following proposed findings of fact and conclusions of law in opposition to the affirmative defenses of laches and estoppel asserted by Defendant, McKillip Industries, Inc. d/b/a USA/Docufinish ("Docufinish") and in accordance with this Court's Orders of March 10, 2009 (Dkt. Entry No. 137) and April 3, 2009 (Dkt. Entry No. 143). For the reasons set forth below, Integrated Cards requests that judgment be entered in its favor on these two affirmative defenses. Integrated Cards also renews its two motions filed under Fed. R. Civ. P. 52(c) for entry of judgment in its favor on these two affirmative defenses (Dkt. Entry Nos. 130 and 132).

## II. Background – Proposed Findings of Fact

### A. The Patent-In-Suit

1.      The patent-in-suit, U.S. Patent No. 5,462,488, issued on October 31, 1995 from an application filed on May 6, 1994. (PTX 1.)[1]

2.      The patent-in-suit is directed to a specific construction of an integrated card product. Claim 1, for example, recites:

> 1. An integrated card and business form assembly capable of being fabricated on conventional label formation equipment, or the like, said integrated card and business form assembly comprising:
> a first layer of material having an upper surface and a lower surface opposite said upper surface;
> a second layer of material comprising at least one card member together with a surrounding border region,
> said second layer of material having a top surface and a bottom surface, and, in turn, said at least one card member and said surrounding border region each having a top and bottom surface, wherein said top surface of said at least one card member is substantially co-planar with said top surface of said surrounding border region and said bottom surface of said at least one card member is substantially co-planar with said bottom surface of said surrounding border region;
> adhesive means operably applied to at least a portion of at least said upper surface of said first layer of material for releasably securing said at least one card member to said upper surface of said first layer of material;
> said at least one card member including means for releasable detachment from said upper surface of said first layer of material and from the surrounding border region without substantial portions of

---

[1] "PTX" refers to Plaintiff's trial exhibit and "DX" refers to Defendant's trial exhibit.

> said adhesive means migrating from the top surface of said first layer of material to said bottom surface of said at least one card member; thereby precluding said bottom surface of said at least one card member from bearing tackiness along said bottom surface after detachment from said upper surface of said first layer of material.

(PTX 1.)

3.      Claims of the patent-in-suit include "means-plus-function" elements, *e.g.*, "adhesive means."

4.      Stanley J. Stack and John J. McKillip were joint owners of the patent-in-suit until September 29, 2005. John J. McKillip then assigned his interest in the patent to Malessa Partners, LLC and Mr. Stack assigned his interest in the patent to Stack, LLC, who subsequently assigned their interests to Integrated Cards (Stipulation, ¶ 14.)[2]

5.      Mr. Stack contributed funding for materials used in testing the invention of the patent-in-suit, as well as patent expenses. He also was with John J. McKillip during testing of the invention of the patent-in-suit. (522:19-24.)

6.      Mr. Stack believes that John J. McKillip developed his expertise for his inventions by receiving a piece of equipment and working to make it faster, better, and more efficient. (553:6-13.)

7.      Tri-Graphics was formed to sell the type of integrated card product described in the patent-in-suit. (530:14-19.)

8.      Mr. Stack and John J. McKillip thought that the type of integrated card product described in the patent-in-suit was so revolutionary that they would be able to get a lot of people to go with that product. (530:20-531:1.)

9.      At that time, there were no other integrated cards of the type that Tri-Graphics was going to make. That was why Mr. Stack and John J. McKillip received the patent-in-suit. (533:5-16.)

10.     Mr. Stack and John J. McKillip knew how to price their new type of integrated card product because John J. McKillip was selling affixed products at that time. (534:13-535:8.)

11.     The assets of Tri-Graphics were auctioned off in October 1997. (587:21-588:4.)

12.     After the auction for Tri-Graphics in 1997, Mr. Stack did not have any contact with John J. McKillip until shortly prior to this action. Mr. Stack did not have a friendly relationship with

---

[2] "Stipulation" refers to the Stipulation of Uncontested Facts, Exhibit A to the Final Pretrial Order (Dkt. Entry No. 112.)

John J. McKillip due to a financial dispute. (557:3-19.)

### B.    Integrated Card Products

13.    The term "integrated card" is a generic term used to refer to many different constructions of products, not all of which infringe. (Stipulation, ¶ 4.)

14.    One type of integrated card at issue consists of a base document and a back patch.  A card shape is die cut into the base, but not through the back patch, so that the card can then be peeled away from the remainder of the base and the back patch. (Stipulation, ¶ 5.)

15.    Some people used the term "integrated card" "to refer to a mounted card or a plastic card on a carrier, so it's kind of a generic term." (531:25-532:4.)

16.    Mr. Casagrande has a patent on a different type of integrated card product from that of the patent-in-suit. (289:12-290:4.)

17.    According to Mr. Casagrande, not all integrated card products are the same.  One can make integrated card products that conform to his patent and integrated card products that do not. (290:5-15.)

18.    Mr. Wooley does not call the product that Docufinish has characterized as an "integrated card" by that name; instead, he calls it a "generic card." (231:14-23.)

19.    Mr. Paveza calls the same product a "clean release" card, with reference to Defendant's Exhibit 16. (306:8-12; 307:11-16.)

20.    One has to test an integrated card product to determine whether it falls under a patent (290:17-19.)

21.    To tell if an integrated card product is the type that is potentially covered by the patent-in-suit, an initial evaluation can be made by first checking the front to see of there is a die cut and then, second, taking off the back to see how many films there are.  If there are two films, then it may be the type of integrated card covered by the patent-in-suit. (592:19-593:16.) Thus,  invasive examination of a product is necessary to make even a preliminary determination whether a given integrated card product is the type that infringes the patent-in-suit.

## III.    Proposed Findings of Fact and Conclusions of Law Regarding Estoppel

### A.    Proposed Findings of Fact

#### 1.    Docufinish Did Not Prove Any "Communication"

22.    Docufinish presented no evidence of being threatened with enforcement of the patent-

in-suit prior to the commencement of this action.

23.     Prior to this action, Docufinish was not threatened with a lawsuit by the owners of the patent-in-suit and did not believe that it would get sued. (65:25-66:9.)

24.     John J. McKillip did not communicate in any way to Docufinish that it was acceptable for them to make the accused integrated card products. In fact, John J. McKillip did not have communications with Docufinish regarding anything up until the time of this lawsuit. (602:16-603:1.)

25.     Mr. Stack did not communicate in any way to Docufinish that it was acceptable for them to make the accused integrated card products.  Mr. Stack did not know that Docufinish was infringing. (551:2-5.)   Mr. Stack did not order any accused integrated card products from Docufinish, and never asked for a quotation for such integrated card products. (558:13-21.)

### 2.     Docufinish Did Not Prove Any Relevant "Reliance"

26.     There is no admissible evidence of the issue of Docufinish's purported "reliance." Docufinish proffered only the entirely conclusory testimony of Stephen McKillip in response to objectionable leading questions. (67:13-68:10; 128:22-129:11.)

27.     Stephen McKillip testified as follows on the issue of reliance:

> Q:     Steve, did you rely on the fact that no one threatened you with infringement, in your understanding – I mean, in your belief that you wouldn't get infringed [sic]?
>
> ***
>
> Q:     That you wouldn't be sued for infringement.
>
> A:     Yes.

(67:13-68:10.)

28.     Stephen McKillip never contacted John J. McKillip to ask him if it was fine to make the integrated card products. (169:11-14.)

29.     Stephen McKillip only assumed that Mr. Stack did not have a problem with Docufinish proceeding to manufacture infringing integrated card products. (172:16-19.)

30.     Docufinish made no effort to secure legal counsel to obtain an opinion on whether the patent-in-suit might cover its process or product when it learned of the patent. (173:8-15.)

31.     Stephen McKillip did not read the patent-in-suit in its entirety prior to this lawsuit. (168:7-169:3.)

32.     Docufinish went ahead with production of integrated card products from the beginning knowing that there was a patent and not reading it. (167:20-23.)

### 3.     Docufinish Did Not Prove Any Legally Cognizable "Prejudice"

33.     Docufinish did not offer any evidence directed specifically to the accused integrated card products and relating to (1) advertising and marketing; or (2) equipment expenditures.

34.     Docufinish's advertising and marketing expenditures were not only for the infringing integrated card products. (151:17-20.) Docufinish proffered no accounting evidence indicating what portion, if any, could properly be allocated solely to the accused integrated card products.

35.     The accused integrated card products are less than ten percent of Docufinish's sales, at least in 2001. (148:24-149:14.) Docufinish did not offer any evidence that its sales of the accused integrated card products ever exceeded ten percent of its total sales. Thus, the accused integrated cards are a comparatively small portion of Docufinish's business.

36.     Docufinish promotes many other products at trade shows besides the accused integrated card products. (157:17-23.)

37.     Docufinish's direct marketing tries to convey all of the types of products that it makes. For example, Docufinish's postcards and sales sheets list all of its products. (Stipulation, ¶45.)

38.     Docufinish in all probability would have been doing the same marketing activities from 1999 forward (reflected in DX 17) even if it had not been selling integrated card products. (159:5-17.)

39.     In response to its own counsel's leading questions, Docufinish admitted that its marketing expenses would have changed but "not by much" and "minorly" had it stopped making the accused integrated cards:

> Q:          -- can you tell me whether -- whatever you spend on advertising, if that amount would have changed had you not promoted integrated cards?

> A:     It would have changed, but not -- not by much.

(101:5-8.)

> Q:     But would the cost have been different?

> A:      I'm not sure what you mean. The cost of our business or...

> Q:     Just advertising in general.

> A:      Yeah.  It would have been minorly different.

(102:6-10.)

40.      The evidence of advertising expenditures offered by Docufinish includes promotion of all products, not just integrated card products:

> Q:      ...It's correct, is it not, that the expenses reflected there in that entire exhibit [DX 17], not just the one page, all are for promoting all of your products, not merely integrated cards, correct?
>
> A:      Yes, we promote all of our products.
>
> Q:      And if you hadn't been selling integrated cards, you still would have been doing all of these same things from 1999 forward, would you not?
>
> A:      In all probability, yes.

(159:5-17.)

41.      Docufinish uses four Tamarack machines and three FME machines to make integrated card products. (106:16-17; 111:21-22).

42.      The first Tamarack machine was purchased in May 1993 (PTX 10), before the application for the patent-in-suit was even filed (PTX 1).  The down payment for the second Tamarack machine was made on December 12, 1995, merely six weeks after the patent-in-suit issued. (PTX 9.)  The third Tamarack machine was paid for on February 6, 1997. (PTX 8.)  The fourth Tamarack machine was ordered on April 30, 1997. (PTX 7.)

43.      Docufinish did not proffer any evidence that it was aware of the patent-in-suit prior to its decisions to purchase the four Tamarack machines.

44.      Stephen McKillip first saw the patent-in-suit in October 1997. (63:17-64:20; DX 19.)

45.      By the time Stephen McKillip first saw the patent-in-suit in October 1997, Docufinish had already purchased all four of its Tamarack machines.

46.      The purchase of the three FME machines was made within months of Docufinish learning that John J. McKillip's companies' assets were sold at auction in late 1997 (63:16-23; 64:6-10) and first seeing the patent-in-suit when it was put up for auction without any bidders (64:19-65:7).

47.      Docufinish had not read the patent-in-suit in its entirety prior to its purchase of the FME machines. (167:23-168:22.)

48.     The testimony compels the inference that the purchases of the three FME machines were made because they were a good deal, not because of any reasonable belief that Docufinish would not get sued for infringing the patent-in-suit. (118:12-19.)

49.     Docufinish did not offer any evidence that the purchase of the three FME machines or the four Tamarack machines were made in reliance upon any communication from either John J. McKillip or Mr. Stack that Docufinish would not get sued for infringing the patent-in-suit.

50.     Docufinish admitted that the Tamarack and FME machines are also used to make integrated labels. (162:12-16; 164:6-16.)  Docufinish could think of no circumstance under which it would have discontinued manufacturing integrated labels during the time period 2000 to 2006. (165:22-25.)

51.     Since their purchase, Docufinish has constantly used the four Tamarack machines for manufacturing integrated labels. (162:12-16.)  Docufinish does not have any records which tell how much of the time this equipment is used for manufacturing integrated labels as opposed to integrated cards. (162:17-20.)

52.     Docufinish purchased patent licenses with the Tamarack machines for making integrated label products, not integrated card products. (PTX 7-9.)  For example, the invoice for the fourth Tamarack machine states: "Also includes $3500 license fee to produce integral labels using transfer tape per U.S. patent no. 4,379,573." (PTX 7.)

53.     There is no evidence that Docufinish would have stopped making the accused integrated card products had it been sued earlier.  Instead, Docufinish conceded that, had it been sued years earlier, it would only have "considered" stopping making the infringing integrated cards. (102:10-13.)  Moreover, there is no documentary evidence supporting this conclusory testimony.

54.     Docufinish has never changed its infringing products, and therefore is in no way prejudiced in proffering evidence in support of a non-infringement defense for products made and sold up to six years before this lawsuit was commenced. (*See* 134:20-136:12.)

55.     Docufinish has not lost any business records that would prevent it from explaining its non-infringement position. (136:3-12.)  As long as Docufinish has been making integrated card products, they have been doing the same thing with the same materials and machinery. (134:20-135:20.)  If one wanted to know what Docufinish's manufacturing process was and what the product looked like previously, it would be just like what they make now.  (135:11-20.)

56.     Docufinish would be able to explain the sales of integrated card products going back

to 2000, as well as its profits and losses from those sales. (138:8-22.)

**B.** **Proposed Conclusions of Law**

57.     In this patent infringement case, Docufinish needed to prove each of three elements to establish a defense of equitable estoppel:

> (i) the patentee must communicate to the accused infringer (by words, conduct or silence) that the patentee will not pursue an infringement claim; (ii) the accused infringer must rely on that communication; and (iii) the accused infringer must establish that it would be materially prejudiced if the patentee is now permitted to proceed with the infringement claim.

*B. Braun Med. Inc. v. Abbott Labs.*, 124 F.3d 1419, 1425 (Fed. Cir. 1997) (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1041-43 (Fed. Cir. 1992)).

**1.** **Docufinish Did Not Prove Any "Communication"**

58.     The Federal Circuit has explained the first required element of an estoppel defense as follows:

> The first element of equitable estoppel concerns the statements or conduct of the patentee which must "communicate something in a misleading way." The "something" with which...the vast majority of equitable estoppel cases in the patent field is concerned, is that the accused infringer will not be disturbed by the plaintiff patentee in the activities in which the former is currently engaged. The patentee's conduct must have supported an inference that the patentee did not intend to press an infringement claim against the alleged infringer....In the most common situation, the patentee specifically objects to the activities currently asserted as infringement in the suit and then does not follow up for years.

*Aukerman*, 960 F.2d at 1042.

59.     Docufinish did not offer evidence of any affirmative communication as described in *Aukerman*, such as a "specific objection" from the patent owners in which infringement was alleged, or any other affirmative statement or action which could reasonably have been taken by Docufinish as giving rise to a knowing acquiescence in Defendant's willful infringement. Thus, Docufinish is relying solely upon alleged inaction or silence on the part of the patent owners.

60.     For an estoppel to arise where the alleged misleading conduct is inaction, the "inaction must be combined with other facts respecting the relationship or contacts between the parties to give rise to the necessary inference that the claim against the defendant is abandoned." *Aukerman*, 960 F.2d at 1042. In other words, "mere silence must be accompanied by some other factor which

indicates that the silence was sufficiently misleading as to amount to bad faith." *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1295 (Fed. Cir. 1992).

61. "In the cases that have applied intentionally misleading silence in the patent infringement context, a patentee threatened immediate or vigorous enforcement of its patent right but then did nothing for an unreasonably long time." *Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992) (citation omitted).

62. An estoppel does not automatically arise even where the patentee has knowledge of the infringing activity, because awareness of the infringing activity alone is not sufficient to render inaction misleading. *R2 Med. Sys., Inc. v. Katecho, Inc.*, 931 F. Supp. 1397, 1416 (N.D. Ill. 1996). "Instead, courts have required communication between the parties either somehow encouraging the challenged activity, or indicating an intent to enforce the patent rights followed by inaction." *Id.*

63. Docufinish failed to offer evidence of a prior accusation of infringement of the patent-in-suit followed by silence. *See Scholle Corp. v. Blackhawk Molding Co.*, 133 F.3d 1469, 1472 (Fed. Cir. 1998).

64. Docufinish failed to offer evidence that it asked whether the accused products infringed the patent-in-suit followed by silence. *See Electromotive Div. of General Motors v. Transp. Sys. Div. of General Electric Co.*, 275 F. Supp. 2d 850, 858-59 (E.D. Mich. 2003).

65. Docufinish failed to offer evidence that the patent owners did not respond to a warning letter and did not affirmatively acknowledge Docufinish's right to market its product without concern. *See Stryker Corp. v. Zimmer, Inc.*, 741 F. Supp. 509, 514-515 (D.N.J. 1990).

66. Docufinish has shown no relationship or contacts between the parties that could possibly give rise to the necessary inference from silence that the infringement claim against Docufinish was intentionally abandoned.

67. Silence alone is not enough to prove this element of estoppel given that there was no prior threat to enforce the patents.

68. Docufinish failed to prove that the patent owners communicated to Docufinish (by words, conduct or silence) that they would not pursue an infringement claim. Thus, Docufinish has not carried its burden of proving the first prong of its affirmative defense of estoppel and, accordingly, judgment on this defense will be entered in favor of Integrated Cards.

### 2. Docufinish Did Not Prove Any Relevant "Reliance"

69. Reliance is a separate element essential to establish an equitable estoppel defense.

*Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 776 (Fed. Cir. 1995).

70.     Docufinish bears the burden to prove that it "substantially relied on the misleading conduct of the patentee in connection with taking some action." *Aukerman*, 960 F.2d at 1042–43.

71.     "Reliance is not the same as prejudice or harm, although frequently confused.  An infringer can build a plant being entirely unaware of the patent.  As a result of infringement, the infringer may be unable to use the facility.  Although harmed, the infringer could not show reliance on the patentee's conduct." *Id.* at 1043.

72.     "'To show reliance, the infringer must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security in going ahead with [its investments].'" *Gasser*, 60 F.3d at 776 (alteration in original) (quoting *Aukerman*, 960 F.2d at 1042–43).

73.     Docufinish did not present sufficient evidence showing that Docufinish relied on any relationship or communication (or lack thereof) from John J. McKillip or Stanley J. Stack.

74.     The conclusory "evidence" of alleged reliance offered by Docufinish is legally insufficient, particularly because it is not corroborated by other evidence tending to prove the truth of the conclusory statement. *See Gasser*, 60 F.3d at 776; *Meyers*, 974 F.2d at 1309 ("Defendants make numerous conclusory assertions that they relied on Meyers conduct, but they have not presented undisputed facts to show that they did....Furthermore, defendants have not shown that they would have altered their conduct if Meyers had sued earlier.").

75.     In similar circumstances, the court in *James River Corp. v. Hallmark Cards, Inc.* found that the Defendant failed to meet its burden of showing reliance for two reasons:

> First, the evidence does not establish a communication or relationship which could reasonably have given Hallmark a sense of security.... Second, and more importantly, the record does not establish a nexus between James River's conduct and Hallmark's actions.  The case law clearly indicates that "reliance" requires a causal connection *between* the sense of security and the action taken in reliance upon it, not just coexistence of the two.

915 F. Supp. 968, 983 (E.D. Wis. 1996) (emphasis in original).

76.     Docufinish did not offer any evidence sufficient to show the required nexus between Integrated Cards' silence and Docufinish's alleged reliance on it.

77.     Instead, Docufinish only showed a consistent course of infringement for several years (all during a period when Docufinish indisputably knew that at least one of the patent owners likely had no financial ability to enforce the patents due to auction of assets of Tri-Graphics and American

Stencil), which continued unabated and even increased after this lawsuit was commenced.

78.    As in *James River*, 915 F. Supp. at 983, Docufinish's taking of the patent owners'
silence as acquiescence was nothing more a business gamble -- made with the knowledge of John J.
McKillip's insolvency in 1997-98 -- that it would not be sued.

79.    Docufinish contends that it relied upon silence alone, but silence alone is not legally
sufficient.  Docufinish proffered only conclusory testimony that is not, particularly without
corroboration, sufficient to prove this element of estoppel.

80.    Docufinish's estoppel defense rests entirely on the patent owners' alleged silence (*e.g.,*
"no one threatened you with infringement").  That is legally insufficient.  Thus, Docufinish has not
carried its burden of proving the second prong of its affirmative defense of estoppel and, accordingly,
judgment on this defense will be entered in favor of Integrated Cards.

### 3.    Docufinish Did Not Prove Any Legally Cognizable Prejudice

81.     Material prejudice resulting from delay "may be either economic or evidentiary."
*Aukerman*, 960 F.3d at 1033.

### a.    Docufinish Did Not Prove Any Economic Prejudice

82.    To demonstrate economic prejudice, it is not enough that Docufinish changed its
economic position by investing in the production of the accused integrated card products. *Hemstreet*,
972 F.2d at 1294.  If such damages necessarily constituted relevant "prejudice" for purposes of laches
and estoppel, then practically every estoppel or laches claim would establish material prejudice.
*Aukerman*, 960 F.2d at 1033.

83.    Instead, to show economic prejudice, an element akin to causation must be shown, *i.e.*,
Docufinish must prove that it suffered the loss of monetary investments or incurred damages which
would have been prevented if the patentee had filed suit sooner. *Id.*  Docufinish's expenditures must
have an "explicitly proven nexus to the patentee's delay in filing suit."  *Hemstreet,* 972 F.2d at 1294.

84.    "The change must be because of and as a result of the delay, not simply a business
decision to capitalize on a market opportunity." *Id.* (citing *Aukerman*, 960 F.2d at 1033).

85.    Docufinish failed to offer any evidence to suggest that it considered altering its
business strategies or operations as a result of the patentee's alleged action or inaction.  *See Genzyme
Corp. v. Atrium Med. Corp.*, No. 00-958, 2003 U.S. Dist. LEXIS 12784, at *21 (D. Del. July 22,
2003).

86.    To prove relevant economic prejudice, Docufinish needed to produce facts that, for

example, show expenditures made in direct reliance upon Integrated Cards' inaction. *Id.* at *19. Docufinish has failed to do so.

87.     The after-the-fact attempt to change the nature of and reason for the advertising and equipment expenditures falls far short of establishing a direct link between the patent owners' alleged silence and Docufinish's "investments."

88.     The purchase of the four Tamarack machines that Docufinish uses to produce the accused integrated card products cannot be a basis for economic prejudice because they were made prior to when Docufinish first saw the patent-in-suit.  It would be impossible for Docufinish to rely on any purported silence (and to be prejudiced by the same) before it even saw the patent-in-suit.

89.     There is no plausible proof that Docufinish purchased its FME equipment in 1998 in reliance on the patent owners' silence or that there was any legally cognizable prejudice causally linked to the patent owners' alleged silence in 1998.  The patent-in-suit issued only a relatively short time earlier, and no one from Docufinish had read the patent.

90.     There is no proof of a causal link between the patent owners' alleged silence and Docufinish's equipment purchases.  Thus, Docufinish has not carried its burden of proving relevant economic prejudice as the third prong of its affirmative defense of estoppel and, accordingly, judgment on this defense will be entered in favor of Integrated Cards.

91.     "Where no evidence shows the infringer stopped selling the allegedly infringing product even after the patentee filed the complaint, a court may draw the inference that the infringer would have continued to sell the infringing product even if the patentee had brought suit earlier." *See James River*, 915 F. Supp. at 978 (citing *Meyers v. Brooks Shoe*, 912 F.2d 1459, 1463 (Fed. Cir. 1990)).  "The inference may follow that the infringer acted independently of the patentee's actions." *Id.*

92.     Docufinish failed to offer evidence affirmatively proving that Docufinish would have stopped the infringing conduct.  The evidence is that if Docufinish had been sued earlier, it would not have stopped its infringement but rather would have continued its course of conduct and fight the lawsuit, just as it did when it was actually sued.

93.     The best evidence of what Docufinish would have done if it had been sued earlier is not found in speculative, conclusory testimony prepared for trial, but rather what the objective evidence shows Docufinish actually did when sued.  And what Docufinish did was to increase its sales and fight the lawsuit, alleging noninfringement and invalidity. *See Meyers*, 974 F.2d at 1308

("None of the defendants submitted evidence that they curtailed design and development of [the accused products] in response to Meyers' suit once it was actually filed.")

94.     Further, the evidence not only shows that Docufinish continued selling infringing integrated cards, but that it did not change its infringing products in response to the lawsuit or obtain a legal opinion on ways in which it might lawfully "design around" the patent-in-suit.

95.     Docufinish admittedly has increased its sales of the accused integrated card products since the filing of the lawsuit.  (104:16-18.)

96.     Docufinish's failure to offer evidence that it tried to produce a non-infringing alternative, or even obtained a legal opinion regarding ways to design around the patent, are also probative of a lack of prejudice.  *See Freeman v. Gerber Prods. Co.*, 466 F. Supp. 2d 1242, 1245 (D. Kan. 2006) (defendant well aware of the potential infringement but deliberately chose not to switch to another alternative); *Oakwood Labs., L.L.C. v. TAP Pharm. Prods., Inc.,* No. 01C-7631, 2003 U.S. Dist. LEXIS 20353, at *7–8 (N.D. Ill. Nov. 12, 2003) ("Defendants' failure to provide any evidence of an alternative scheme or plan for changing the structure of their product in the face of infringement weighs in favor of determining that the Defendants suffered no material economic prejudice.").

97.     Docufinish has failed to offer sufficient proof of economic prejudice resulting from the timing of this lawsuit.

### b.     Docufinish Did Not Prove Any Evidentiary Prejudice

98.     Docufinish's liability for damages due to any past infringement is limited to six years prior to the filing of this action. 35 U.S.C. § 286.

99.     The construction of Docufinish's accused integrated cards products has not changed from the beginning of that time period to the present.  Docufinish has sales information from the beginning of that time period to the present.  Thus, Docufinish faces no evidentiary prejudice in showing what its sales of the accused products were and how the accused products are constructed for the entire period for which it faces liability (April 2000 through present).

100.     Conclusory assertions of evidentiary prejudice cannot form the basis of a laches or estoppel defense. *Meyers*, 974 F.2d at 1308.

101.     Any claim that Docufinish suffered prejudice because it cannot locate evidence in support of its laches and estoppel defenses is not a legally cognizable evidentiary prejudice and amounts to bootstrapping. *See Dimension One Spas, Inc. v. Coverplay, Inc.*, No. 03cv1099,  2008 U.S. Dist. LEXIS 69526, at *43 (S.D. Cal. Sept. 5, 2008).

102.   "[L]oss of memory, witnesses, or documentary evidence alone does not establish prejudice… The risk of loss of evidence is inevitably a hazard of complex litigation." *James River*, 915 F. Supp. at 979-980.  Evidentiary prejudice requires more than inability to obtain evidence the party ideally wants. *Id.*

103.   Docufinish has failed to identify any missing evidence going to the merits of this action with any of the required specificity.

104.   Docufinish has failed to offer sufficient proof of evidentiary prejudice resulting from the timing of this lawsuit.

## IV.   Proposed Findings of Fact and Conclusions of Law Regarding Laches

### A.   Proposed Findings of Fact

#### 1.   Docufinish Did Not Prove Any "Delay"

##### a.   Stanley J. Stack's Lack of Knowledge

105.   Mr. Stack and other partners started Business Forms Sales around 1973. It sold business forms to companies that need invoices and packing slips. (515:20-516:1.)  Mr. Stack left Business Form Sales in 2002 and then operated Stack, Inc. out of his house.  Mr. Stack just kept eight or ten accounts to which he had sold business forms. (516:6-19.)  Mr. Stack retired four years ago. (515:18-19.)

106.   Mr. Stack was unaware that Docufinish was making integrated cards pursuant to the process disclosed in the patent-in-suit. (545:15-17.)

107.   If Mr. Stack had been aware of the infringement by Docufinish, he would have reacted immediately. (547:5-8.)  If Mr. Stack would have had any reason to believe there was a potential infringer of the patent-in-suit, he would have contacted his attorney, Kevin Murnighan, and have him contact John J. McKillip. (558:22-559:2.)

108.   Mr. Stack paid maintenance fees for the patent-in-suit because he believed that it was very well-written, and did not want anyone to infringe. (559:3-10.)

109.   Mr. Stack has never bought any integrated card products from Docufinish.  Mr. Stack has never asked Docufinish for a quotation for integrated card products from Docufinish. (545:15-17; 558:13-21.)

110.   When American Stencil went out of business, Mr. Stack called on Docufinish for frame stencils.  Mr. Stack knew from John J. McKillip that Docufinish was producing the same frame

-14-

stencil that he believes John J. McKillip developed. (542:17-543:1; Defendant's Exhibit 20.)

111.    Docufinish proffered an alleged quotation from Docufinish to Mr. Stack. (DX 21.)
Mr. Stack does not recall seeing the quotation. (543:22-24; 545:25-546:2.)

112.    There is nothing in DX 21 that tells Mr. Stack whether or not this quotation is for the
type of product that is within the scope of the patent-in-suit. The words "integrated card" alone do
not tell Mr. Stack whether it is within the scope of the patent-in-suit. (558:2-12.)

113.    Even if Mr. Stack would have received DX 21 in 2001, it would not have meant
anything to him. (558:10-12.) Mr. Stack did not know and still does not know what the term "lite lift"
means. (544:7-12; 558:8-9.)

114.    Mr. Stack's testimony at trial and at his deposition was not in any way affected by his
medical condition. (556:17-557:1.)

### b.    John J. McKillip's Lack of Knowledge

### 1)    John J. McKillip's Background

115.    In the printing industry, a distributor or resller is one that buys from a manufacturer,
but does not manufacture. (578:23-25.) A manufacturer is somebody that takes raw material and
converts it into a finished product. (579:1-3.)

116.    John J. McKillip started work for American Business Forms, a distributor, in 1965
selling business forms. (578:13-22; 579:4-8.) John J. McKillip subsequently worked for various
companies as a salesman of business forms until he started Illinois Stencil, a distributor. (579:11-15;
580:8-14; 581:2-18.)

117.    Illinois Stencil, which re-sold stencils, merged with American Stencil in 1979.
(Stipulation, ¶ 9.)

118.    American Stencil was a manufacturer of business forms, including stencils. (581:25-
582:7.)

119.    John J. McKillip hired Stephen McKillip as a salesman at American Stencil, beginning
in the late 1970s or early 1980s until 1986 or 1987. (582:7-583:1.)

120.    When Stephen McKillip stopped working for John J. McKillip's company American
Stencil, the parting was unexpected and not amicable. (583:23-584:21.)

121.    After Stephen McKillip left American Stencil, he called John J. McKillip and told him
that he had started a company called United Stencil and Affixing. (584:22-585:7.)

122.    At first John J. McKillip had some idea what United Stencil and Affixing was doing

because people would come and ask for their tooling back from American Stencil and take it to United Stencil and Affixing. John J. McKillip lost most of his business. (585:25-586:19.)

123.    American Stencil ceased business and was auctioned off for the benefit of creditors in October 1997, at the same time as Tri-Graphics. (587:21-588:4.)

124.    John J. McKillip filed a patent infringement lawsuit against United Stencil and Affixing in 1993. That lawsuit related to a reverse frame stencil that Stephen McKillip had marketed through John J. McKillip's company American Stencil for a number of years. (586:20-587:1.)

125.    That 1993 patent infringement lawsuit was resolved favorably to John J. McKillip, with United Stencil and Affixing paying money to John J. McKillip and agreeing to destroy all of the remaining material used to make the reverse frame stencils. (587:13-18.)

126.    John J. McKillip learned of the infringement when a sample was sent to him, along with a telephone call asking if he could manufacture it. He asked where the sample came from, and was told United Stencil and Affixing. John J. McKillip then took that information to a patent attorney. (587:2-10.)

127.    After the auction of American Stencil and Tri-Graphics in October 1997, John J. McKillip worked for AmeriPrint as a salesman of business forms. (591:23-592:2.)

128.    John J. McKillip wrote a business plan while at AmeriPrint. The integrated card products discussed in that business plan were for the so-called thumb-notch card. While the thumb-notch card can be called an integrated card, it is different than the type of integrated card of the patent-in-suit. (592:3-18.)

129.    The reference in the business plan to pricing was solely based upon what John J. McKillip knew about AmeriPrint's pricing and from seeing what was previously done during a visit to an equipment vendor. (621:23-623:24.)

130.    John J. McKillip was involved in a patent infringement suit against AmeriPrint and others relating to a piece of equipment that he designed. He learned that AmeriPrint was infringing from his work at AmeriPrint. He was told about other defendants in that action from an equipment salesman. (599:2-22.)

131.    After AmeriPrint, John J. McKillip worked with his wife's company, Integrated Label Corporation, which until recently was a home-based business. (594:1-3; 595:4-10.)

132.    Integrated Label does not sell a lot of integrated card products. (595:19-21.)

133.    Integrated Label gets its business through the internet and mailings. Up until 2006,

Integrated Label did not exhibit at trade shows. Integrated Label does not have any sales people. Integrated Label does not receive many visitors. (595:22-596:1; 600:1-7.) Thus, John J. McKillip is not an active figure in the printing industry.

134.    John J. McKillip attended a trade show in Orlando, Florida in 2005 just to pick up a sample of a Docufinish integrated card product because his attorneys requested a sample prior to filing a lawsuit. (596:5-10; 601:7-19.)

135.    That was the first time that John J. McKillip saw an integrated card product made by Docufinish that he suspected might be covered by the patent-in-suit. (596:5-13; 600:25-601:6.)

136.    John J. McKillip first suspected that Docufinish may be infringing the patent-in-suit when someone called and asked if he made integrated cards like United Stencil and Affixing. This was shortly before he went to Orlando, Florida in 2005 to obtain a sample. (601:20-602:3.)

137.    If John J. McKillip would have learned of Docufinish's infringement sooner, he would have brought it to his attorneys' attention – the same thing he did in this action. He had no reason to ignore their infringement, but had no suspicion whatsoever that they were infringing the patent-in-suit. (602:11-15; 603:2-8.)

### 2)    John J. McKillip Did Not Learn of the Accused Products From Brian Wooley

138.    John J. McKillip did not discuss or ask Mr. Wooley about any Docufinish products during the four or five months in 1996 that Mr. Wooley worked for Tri-Graphics. (589:8-16; Stipulation, ¶ 20.)

139.    Mr. Wooley's testimony regarding telling John J. McKillip that Docufinish made "generic cards" is not corroborated by any other witness.

140.    There is no evidence that Mr. Wooley told John J. McKillip how Docufinish was making its "generic cards."

### 3)    John J. McKillip Did Not Learn of the Accused Products from Chuck Casagrande

141.    John J. McKillip did not have a meeting with Mr. Casagrande, Stephen McKillip's stepson, at Tri-Graphics. John J. McKillip would have recalled such a meeting because he would have been very reluctant to let Mr. Casagrande into the production area because he used to work for American Stencil (John J. McKillip's company) and then left to work for United Stencil and Affixing (Stephen McKillip's company). (590:1-591:5.)

142.     John J. McKillip did not purchase anything from Mr. Casagrande, nor would he. That is because Mr. Casagrande was a reseller, buying from the same people from which John J. McKillip could buy. There would be no sense in buying from Mr. Casagrande. (591:6-16.)

143.     Mr. Casagrande's testimony that he allegedly met with John J. McKillip at Tri-Graphics is not corroborated by any other witness or exhibit.

144.     The sample book that Mr. Casagrande allegedly showed John J. McKillip changed over time. (284:11-285:4.) Mr. Casagrande does not have a specific sample of what he allegedly showed to John J. McKillip. (285:12-13.) Mr. Casagrande admitted that he has no specific memory of showing John J. McKillip any specific integrated card products. (286:5-20.) The content of the purported sample book is not corroborated by any other witness or exhibit (and is denied by John J. McKillip.)

145.     There was no testimony that, even if Mr. Casagrande did show John J. McKillip the Docufinish product purportedly in the sample book, that John J. McKillip did invasive testing necessary to gain even a suspicion that the purported product was potentially an infringing product.

146.     Mr. Casagrande did not testify that he specifically showed John J. McKillip the actual Docufinish product (DX 31-A) that was purportedly in the missing sample book. The testimony is that he doesn't "have a specific sample," but knows that he "showed him documents with USA in it." (285:12-13.)

147.     Mr. Casagrande also admitted that he has no specific memory of showing John J. McKillip any specific integrated card products. (286:15-18.)

148.     There was no testimony that, even if Mr. Casagrande did show John J. McKillip the Docufinish product purportedly in the sample book, John J. McKillip knew it was made by Docufinish. That is because it does not bear Docufinish's name. (DX 31-A.)

149.     Someone looking at a document that had USA on it wouldn't necessarily conclude that that's a product coming from any individual company. It depends on the individual. (286:23-287:2.)

150.     There is no evidence by Docufinish that John J. McKillip knew in 1996 that Docufinish's products bore the name USA.

151.     Docufinish's name does not appear on integrated card products that are actually ordered: "Our name of our company would never appear on anything we manufacture." (169:22-25.) Thus, even if John J. McKillip or Mr. Stack would have seen an infringing integrated card product

made by Docufinish, they would not have known it was made by Docufinish.

### 4) John J. McKillip Did Not Learn of the Accused Products at a Trade Show in Baltimore in 1998

152. John J. McKillip did not attend a trade show in Baltimore, Maryland in October 1998. (596:14-15.)

153. The fact that John J. McKillip did not attend the 1998 Baltimore trade show is confirmed by the organizer, DMIA. DMIA maintains records of who attended which trade show, including trade shows from 1998. (DMIA Trans., 7:16-21; 8:8-14.)

154. DMIA has no record of John J. McKillip attending the 1998 Baltimore trade show. (DMIA Trans., 8:15-9:4; 9:19-10:21; PTX 5.)

155. The organizer of the 1998 Baltimore trade show had a security check to ensure that only registered people presenting identification were admitted. (DMIA Trans., 22:3-23:12.) Thus, it is unlikely that John J. McKillip would have been able to gain admittance to the 1998 Baltimore trade show without being registered.

156. John J. McKillip would have remembered if he had attended a trade show in Baltimore, Maryland in October 1998. One reason is that his wife did not speak English well and he would not have felt comfortable leaving her alone. Another reason is that he was working for AmeriPrint at that time. Yet another reason is that he met or talked with his attorney, Anthony Campanale, at that time. He could not have talked with his attorney from Baltimore. (596:16-598:12).

157. Plaintiff's Trial Exhibit 6 is an attorney invoice from Mr. Campanale to John J. McKillip which contains entries on October 7, 1998 and October 8, 1998 stating "Telephone conference with client" and "Court appearance on motion; Conference with Judge and opposing attorney; Conference with client," respectively. These invoices corroborate John J. McKillip's testimony that he was not at the trade show in Baltimore, Maryland in 1998.

158. The testimony of John W. McKillip, Stephen McKillip's son and Docufinish's Vice President of Sales (341:2-11), that he saw John J. McKillip at the 1998 Baltimore trade show is not corroborated by any other witness or document, despite there being three other people who were also working that booth (342:3-7).

159. Docufinish offered no testimony from any of the other three people that they saw John J. McKillip at that show. Docufinish offered the testimony from one of the three, Ms. Storjohann,

who admitted that she did not see John J. McKillip at this trade show. (367:8-10.)

160.    John J. McKillip's testimony that he did not attend the 1998 Baltimore trade show, corroborated by DMIA documents and testimony and an attorney invoice, is more credible than John W. McKillip's entirely uncorroborated testimony.

### 5) John J. McKillip Did Not Learn of the Accused Products from Attending Trade Shows

161.    Gary St. Onge testified that he saw John J. McKillip at a trade show in March 2000 and two trade shows in 2001. Mr. St. Onge cannot say with certainty that he saw John J. McKillip at each national trade show since then. (215:12-21; 220:18-221:18; 223:12-224:7.)

162.    For the few trade shows that John J. McKillip attended, he did not look at other exhibitors' booths and displays because they were manufacturers, the same as Integrated Label. He does not buy any of the exhibitors' products. Instead, John J. McKillip would walk around and, if he saw a distributor that he knew, he would say hello. (453:12-454:1.)

163.    The exhibitors at trade shows are manufacturers that sell to resellers/distributors. Integrated Label is a manufacturer. Thus, John J. McKillip has no reason to believe he would set get business from a manufacturer. (598:13-22.)

164.    Setting aside the unsupported allegation by Docufinish regarding the Baltimore trade show in 1998, Docufinish offered no evidence that John J. McKillip visited a Docufinish booth at any trade show until Orlando in 2005.

### 6) John J. McKillip Did Not Learn of the Accused Products from Industry Literature

165.    While Integrated Label did receive some industry literature from a trade organization, DMIA, John J. McKillip did not look at them because he does not read well. (442:15-19; 444:14-23; 483:17-485:15.)

166.    Docufinish did not offer any no evidence that any specific industry literature received by John J. McKillip disclosed anything more about the accused products than the words "integrated cards."

### 2.    Docufinish Did Not Prove Any Legally Cognizable "Prejudice"

167.    The prejudice prong of the laches analysis is the same as that for the estoppel analysis. *Aukerman*, 960 F.2d at 1043. Thus, the proposed findings of fact set forth in Section III.A.3 are hereby incorporated by reference in their entirety.

### B.    Proposed Conclusions of Law

168.    Docufinish needed to prove two elements to establish the affirmative defense of laches:

> 1.    the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and
>
> 2.    the unreasonable delay operated to the prejudice or injury of the defendant.

*Aukerman*, 960 F.2d at 1032.

169.    Laches ultimately turns on underlying factual determinations. *Hemstreet*, 972 F.2d at 1292. The defendant always has the burden of proving laches. *Id.* at 1293.

### 1.    Docufinish Did Not Prove Any "Delay"

170.    As the Federal Circuit has stated, "[a]lthough our precedent is clear that the patentee's constructive knowledge of an infringer's behavior can suffice to start the laches clock, it is equally clear that the patentee must have actual or constructive knowledge of an act of infringement that gives rise to a legal claim before that clock begins to run against the patentee." *Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1297–98 (Fed. Cir. 2004) (district court abused its discretion by clearly erring in starting the laches clock before patentee should have known that it had an infringement claim; no contact between former supplier/vendor for years prior to lawsuit).

171.    While an "absolute assurance" of infringement is not necessary, more than a mere suspicion is required to start the laches clock running. Integrated Cards "must have had more than a mere suspicion ... of [defendant's] alleged infringement in order to activate the laches clock." *Rockwell Int'l Corp. v. SDL, Inc.*, 103 F. Supp. 2d 1192, 1197 (N.D. Cal. 2000).

172.    Stanley J. Stack did not know of Docufinish's alleged infringement until shortly prior to this lawsuit. The few business dealings that Mr. Stack had with Docufinish were unrelated to the accused integrated card products.

173.    The quotation of DX 21, if received by Mr. Stack, would not have advised Mr. Stack as to what type of integrated card product Docufinish was quoting.

174.    Mr. Stack had been out of the printing industry for several years and, after October 1997, had no involvement with selling integrated card products. Thus, it is objectively reasonable that Mr. Stack did not have any suspicion of Docufinish's infringement.

175.    John J. McKillip did not know of Docufinish's alleged infringement until shortly prior

to this lawsuit.

176. It is objectively reasonable that John J. McKillip did not learn of Docufinish's alleged infringement from trade publications due to the fact that John J. McKillip does not read those publications due to his difficulty reading. Even if John J. McKillip had read the trade publications Docufinish alleged he received, the words "integrated cards" alone would not have caused John J. McKillip to develop a suspicion that Docufinish may be infringing because there are different types of integrated card products, many of which do not infringe.

177. It is objectively reasonable that John J. McKillip did not learn of Docufinish's alleged infringement from the few trade shows that John J. McKillip did attend because there is no credible evidence that John J. McKillip ever went to a Docufinish booth at a trade show until Orlando in 2005, shortly before this lawsuit.

178. John J. McKillip has a history of taking legal action when he learns of potential infringement of one of his patents, as evidenced by the 1993 suit against Docufinish and the lawsuit against AmeriPrint and others.

179. Given John J. McKillip's past history of taking legal action when he learns of potential infringement of one of his patents – including a patent infringement lawsuit against Stephen McKillip in 1993, settled favorably to John J. McKillip – a reasonable inference can be drawn that he did not know of Docufinish's infringement until shortly prior to filing this lawsuit.

180. Docufinish has offered no credible explanation for why John J. McKillip would have waited for years to file this lawsuit if he had known of the infringement.

181. Docufinish has not proven that the patent owners delayed filing suit for an unreasonable and inexcusable length of time from the time the patent owners know or reasonably should have known of the accused infringement. Thus Docufinish has not carried its burden of proving the first element of laches and, accordingly, judgement will be entered in favor of Docufinish.

## 2. Docufinish Did Not Prove Any Legally Cognizable "Prejudice"

182. The prejudice prong of the laches analysis is the same as that for the estoppel analysis. *Aukerman*, 960 F.2d at 1043. Thus, the proposed conclusions of law set forth in Section III.B.3 are hereby incorporated by reference in their entirety.

183. Docufinish has failed to prove that it suffered either evidentiary or economic prejudice from the timing of this lawsuit. Thus, Docufinish has not carried its burden of proving the second

prong of its affirmative defense of laches and, accordingly, judgment on this affirmative defense will be entered in favor of Integrated Cards.

### 3.    No Presumption of Laches Applies

184.    There is a presumption that the elements of laches are satisfied only if Docufinish proves that there was a six-year delay in filing the lawsuit from the time that the patent owners knew or should have known of their claim. *Hemstreet*, 972 F.2d at 1293.

185.    Here, the presumption does not apply because Docufinish failed to prove that the patent owners knew or should have known of the infringing activity more than six years before filing suit.

186.    Even where the presumption applies, the burden of proof does not shift; it only requires the patent owner to come forward with evidence sufficient to raise a genuine dispute as to either delay or prejudice. *Id.* ("the presumption of laches which arises after a defendant proves a six-year delay is a 'double bursting bubble' which the plaintiff punctures with introduction of evidence sufficient to raise a genuine dispute as to either delay or prejudice.").

187.    Such evidence was presented via the admissions of Docufinish's witnesses regarding a lack of prejudice. Thus, whether or not the presumption applies, the evidence adduced in Docufinish's own case proves a lack of prejudice.

### 4.    Docufinish's Attempts at Collateral Impeachment of John J. McKillip Fail

188.    Docufinish tried to impeach John J. McKillip on collateral issues, such as whether he had a credit card in 1998, whether a certain checking account at Banco Popular was a personal account or business account, and what types of expenses he had in 1998. These are unrelated to any element of laches that Docufinish must prove.

189.    Docufinish attempted to attack John J. McKillip's character for truthfulness using extrinsic evidence, which is improper under Fed. R. Evid. 608(b). Accordingly, these are collateral matters and any attempts by Docufinish to impeach John J. McKillip on these collateral matters are disregarded.

## V.    Docufinish Has "Unclean Hands" and is Not Entitled to Equitable Relief

190.    "[T]he trial court must, even where the three elements of equitable estoppel are established, take into consideration any other evidence and facts respecting the equities of the parties in exercising its discretion and deciding whether to allow the defense of equitable estoppel to bar the

191.    One such factor is whether the infringer "has engaged in particularly egregious conduct which would change the equities significantly in plaintiff's favor." *Id.* at 1033 (citation omitted). For example, a patentee may defeat a laches defense if the patentee can prove that the accused infringer "was itself guilty of misdeeds toward the patentee." *Id.* at 1038.

192.    Under the law as it stood during years of Docufinish's infringement until filing of this lawsuit, the failure to obtain a legal opinion of non-infringement is evidence of willful infringement, not a defense. *See SRI Int'l. v. Advanced Tech. Labs.*, 127 F.3d 1462, 1468 (Fed. Cir. 1997) ("Prudent behavior generally requires that competent legal advice was obtained before the commencement of the infringing activity." (citations omitted)).

193.    The facts that Stephen McKillip did not read the patent in its entirety prior to this lawsuit (168:7-169:3) and that Docufinish made no effort secure legal counsel to obtain an opinion on whether the patent-in-suit might cover its process or product (173:8-16) support the conclusion that, if ultimately found to infringe the patent-in-suit, that such infringement was willful. *See Gasser*, 60 F.3d at 775; *see also TWM Mfg. v. Dura Corp.*, 592 F.2d 346, 349 (6th Cir. 1979).

194.    Docufinish had a duty to avoid infringement, but did no investigation. Docufinish failed to put forth any evidence denying willful infringement.

195.    Another equity that weighs in Integrated Cards' favor is that Docufinish has been able to reap the benefits and good will from sales. *Whitehall Corp. v. Western Geophysical Co.,* 664 F.Supp. 1056, 1074, (S.D. Tex. 1986) ("Western avoided licensing fees, royalties...while reaping the benefits of profit and good will from sales..."). Docufinish will not be liable for many of the years of sales of infringing products because damage recovery by Integrated Cards is statutorily limited to the period of only six years prior to suit. *See* 35 U.S.C. § 286.

196.    Because the equities weigh against Docufinish and in favor of Integrated Cards, judgment is entered against Docufinish on its affirmative defenses of laches and estoppel.

## VI.    Conclusion

For the foregoing reasons Integrated Cards requests that the Court enter judgment against Docufinish on the affirmative defenses of estoppel and laches. Docufinish failed to prove any of the essential elements of its estoppel and laches defenses, and it bears the burden of proof for each one of them.

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BIFURCATED TRIAL OF DEFENDANT'S AFFIRMATIVE DEFENSES OF LACHES AND ESTOPPEL was caused to be served upon the following in the manner set forth below on April 17, 2009:

***Via Electronic Delivery:***

Jacqueline A. Criswell
TRESSLER, SODERSTROM, MALONEY & PRIESS
233 South Wacker Drive, Suite 2200
Chicago, Illinois 60606
(COUNSEL FOR DEFENDANT AND COUNTER CLAIMANT, MCKILLIP INDUSTRIES, INC.
D/B/A USA/DOCUFINISH)


Michael P. Chu
BRINKS HOFER GILSON & LIONE
NBC Tower – Suite 3600
455 N. Cityfront Plaza Drive
Chicago, Illinois 60611-5599
(COUNSEL FOR DEFENDANT AND COUNTER CLAIMANT, MCKILLIP INDUSTRIES, INC.
D/B/A USA/DOCUFINISH)


  s/Jon A. Birmingham
*Attorney for Integrated Cards, L.L.C.*