JAC/jr/456574

1693-11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INTEGRATED CARDS, L.L.C., an Illinois limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Act No. 06 C 2071 |
| MCKILLIP INDUSTRIES, INC. d/b/a USA/DOCUFINISH, an Illinois corporation, | ) ) ) | Judge Kendall |
| Defendant. | ) ) | Magistrate Judge Brown |
| MCKILLIP INDUSTRIES, INC. d/b/a USA/DOCUFINISH, an Illinois corporation, | ) ) ) | |
| Counter-Plaintiff, | ) ) | |
| v. | ) ) | |
| INTEGRATED CARDS, L.L.C., an Illinois limited liability company, | ) ) ) | |
| Counter-Defendant. | ) | |

**PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW OF USA/DOCUFINISH**

Defendant/Counter-Plaintiff, McKillip Industries, Inc. d/b/a USA/Docufinish (hereinafter "USA"), submits its Proposed Findings of Fact and Conclusions of Law in support of the bench trial held on its defenses of laches and equitable estoppel.

**I.     FINDINGS OF FACT**

Throughout this document, the use of "John" refers to John J. McKillip.[1]

**A.     USA's Integrated Card Product Was Open and Notorious**

1.      Stephen M. McKillip ("Steve") has been president of USA for the past 22 years. "USA", which was a name that was derived from USA's original name "United Stencil and

---

[1] Citations to the Trial Transcript are to a page number and line and identify the witness. "Stip. No. ____ refers to the parties' Stipulation of Uncontested Facts in the Pretrial Order.

Affixing", manufactures value-added products for the business forms industry.  (p.17:1-24 Steve).

2.      Steve has a wide range of technical experience within the industry.  (p.35:19-p.36:12 Steve).

3.      Integrated Cards, L.L.C.  ("Integrated"), the Plaintiff, is in the same industry as USA (p.18:22-p.19:12 Steve).

4.      The president of Integrated is John J. McKillip, who is Steve's brother.  (p.19:10-12 Steve).

5.      United Stencil & Affixing, later named USA/Docufinish, has been known in the industry as USA.  (p.183:13-23 Schulty).

6.      USA attended DMIA trade shows from at least 1995-2006 and TradeMart shows from at least 1994-2005 (Stip. No. 32).  Def's. Ex. 17 reflects that USA attended the DMIA annual shows from at least 1999-2006, along with TradeMarts throughout the country, and USA always had a booth at these trade shows.  USA attended 100-125 trade shows since 1997.  (Def. Ex. 17; p.72:21-76:4; Steve; p.350:2-10, 24-p.351:6 JW).

7.      USA always displayed its integrated card products, and samples of integrated cards were given away at these trade shows and it had signage advertising its integrated products. (p.78:13-20 Steve; p.351:13-18 JW).

8.      Throughout the years, USA has prominently advertised its integrated cards in trade publications and is also listed as a source for integrated cards in these publications.  Def's. Ex. 23 is a sample of DMIA monthly magazines, buyer's guides and Who's Who in the Business Printing and Document Management Industry which reflect this.  (Def's Ex. 23; p.79:10-89:12 Steve: Stip. No. 33).

9.      USA continually promoted its integrated card products through "thousands and thousands" of direct mailings and other promotional materials, including binders, information sheets (such as Def's Ex. 22) and product sample packs.  (p.89:1-p.91:13; p.92:1-8 Steve; p.352:19-p.356:9 JW).

10.     Samples of USA's integrated cards could be easily obtained at any time by just calling up and asking USA, picking up samples at one of the hundreds of trade shows where USA exhibited, through samples in trade publications or sent in an informational booklet, such as Def's Ex. 22 through a mailing list.  (p.89:14-p.91:21 Steve).

11.    St. Onge attended every national trade show since 1990 and many other regional trade shows each year.  He saw USA at most, if not all of them, and USA always had a booth where it displayed its products.  (p.222:3-21 St. Onge).

12.    USA has been manufacturing and selling the accused integrated cards continuously since at least 1995, more than 10 years prior to the filing of the instant lawsuit, as shown in the Defendant's Ex. 14.  (Stip. No. 6; p.45:19-49:25 Steve)

13.    Def's Ex. 16 is a sample of USA's accused card at issue.

**B.    Integrated's Knowledge/Involvement in the Business Forms Industry Through John J. McKillip and Stanley Stack**

14.    John obtained his technical knowledge about fabricating integrated cards from being around presses and in the printing industry since 1965.  (p.388:24-p.389:4 John).

15.    In the early 1970s, John and his previous wife started a company called Illinois Stencil, which re-sold stencils and which merged with American Stencil in 1979, of which John was President.  American Stencil remained in operation until 1995.  (Stip. No. 9).

16.    John began making integrated cards at American Stencil on a Profiteer press as a part of his research and development of integrated cards.  (p.393:7-p.394:4 John).

17.    John started a company called Tri-Graphics in 1993.  One of the products Tri-Graphics made was an integrated card of the type described in the '488 patent on a Profiteer press and John directed the pressmen as to the process for making these cards.  (Stip. No. 10; p.398:3-p.399:18 John).

18.    John supervised the production process at least as early as 1996 at Tri-Graphics and directed that the pressmen run tests on integrated cards.  (p.233:18-19; p.234:22-p.235:10; p.238:13-p.239:14 Wooley).

19.    In response to John's phone call to Casagrande at Precision Coated Products seeking a quote for laminate to produce integrated cards, Casagrande sent John quotes dated July 15, 1996, identified as Defendant's Exs. 28 and 29, which included a quote for Lite Lift Dry laminate used only to produce integrated cards.  (p.249:18-p.251:16 Casagrande).

20.    In November and December, 1996 Precision Coated Products sold Tri-Graphics laminate that can be used to produce integrated cards, as reflected in the three invoices identified as Defendant's Exs. 32-34.  (p.276:8-278:2 Casagrande).

21.     During his sales call on John at Tri-Graphics, Casagrande observed an integrated card being run on the press. (p.276:1-4 Casagrande).

22.     Specialty Tape & Label (Specialty) was a member of the DMIA trade association and displayed its products at industry trade shows, including its integrated cards of the type reflected in Defendant's Ex. 3. John attended these trade shows. (p.327:9-p.328:6 Paveza).

23.     Jim Schulty (Schulty) President of AmeriPrint Corp., interviewed John in November, 1997 for a job at AmeriPrint. John explained his background in the industry and familiarity with integrated cards, held himself out as an expert on integrated cards and showed Schulty a card he had made. (p.185:14-15, p.186:21-p.187:8 Schulty).

24.     John worked for AmeriPrint as a salesman from December, 1997-June, 1999, with his primary focus on promoting integrated cards and labels. (p.187:12-25 Schulty).

25.     John was very aware of what was going on in the industry and had a clientele. While at AmeriPrint, he came up with the idea to promote integrated cards under the AmeriCard name and discussed with Schulty other companies that make integrated cards. (p.188:24-p.191:13 Schulty; Stip. No. 27).

26.     USA/Docufinish is known in the industry as USA and is a competitor of AmeriPrint. (p.219:5-15 St. Onge).

27.     On his own initiative, John prepared a business plan for AmeriPrint dated January 25, 1998 (Def.'s Ex. 8), which explained how the industry is making integrated cards, suggested strategies AmeriPrint should pursue to sell integrated cards and stated that a 3% commission will be paid on an integrated card patent, of which John was the owner. (p.191:22-p.194:4 Schulty).

28.     John proposed that he be paid a 3% commission for his invention of the thumb notch integrated card patent, which was in the filing process at the time. John told Schulty that he had this idea but had not marketed it to anyone and if he obtained a patent he wanted to be paid. (p.428:6-429:1 John).

29.     In the business plan John prepared for AmeriPrint, he acquired the knowledge to speak about what the industry was doing because he had visited the Tamarack Company, where he was shown the equipment for making integrated products and told what the industry was doing. (p.429:3-21 John).

30.     John started working at Integrated Label Corp. in July, 1999 and the next month talked to Paveza at Specialty about manufacturing product for it. Integrated Label Corp.

marketed itself as a source of integrated labels and cards and Specialty made integrated labels and cards for it. (p.437:11-440:10 John).

31.     Once Integrated Label Corp. became a DMIA member in July, 1999, John received their mailings, including the monthly magazines, Who's Who and buyers' guide publications, which were addressed to John. (p.442:15-444:9 John; Def.'s Ex. 12).

32.     John obtained a distributor list from the DMIA publications, including the Print Solutions magazines, to compile a mailing list for Integrated Label Corp. to use for marketing purposes. (p.447:15-449:10 John).

33.     The October, 2002 Print Solutions Annual Buyers' Guide at p. 39 lists makers and sellers of integrated cards, including AmeriPrint, USA, Specialty Tape and Integrated Label Corp., the company for which John worked. (Def.'s Ex. 23; p.208:21-p.210:1 Schulty).

34.     John stopped at the booth of Libman Business Forms at the March, 2000 TableTop trade show in Rosemont, IL, where Libman was promoting its integrated cards and labels. (p.215:13-p.216:9 St. Onge).

35.     When St. Onge made a sales call on John at Integrated Labels Corp. after the March, 2000 trade show, John reviewed the products in Libman's sample packet, showed St. Onge two integrated cards of his own and told St. Onge that he had patents on these integrated cards. (Stip. No. 37: p.217:10-p.218:23 St. Onge).

36.     From 1985 to the present, John continued to invent various types of integrated labels and integrated cards and continued to file patent applications for these inventions throughout these years, which resulted in the issuance of ten patents. (Def's. Ex. 5).

37.     While working for Integrated Label Corp., John sent a marketing letter to a distributor representing that Integrated Label can manufacture integrated labels and integrated cards more economically then anyone else. He gained his knowledge regarding how others in the industry were producing integrated cards when he visited the Tamarack Corp. while employed at AmeriPrint, during which one of the owners of the Tamarack Corp. explained how others in the industry make integrated cards. (Def's. Ex. 36; p.620:7-p.624:19 John).

38.     John submitted a Statement of Applicant document to the U.S. Patent and Trademark Office in March, 2000 attesting that he has been intimately involved in the business form industry for over 20 years. (Def's. Ex. 4; p.627:19-p.628:17 John).

39.     Stanley Stack (Stack) worked in the business forms industry since at least 1973 and started Business Forms Sales that year.  He continued to work at Business Forms Sales until 2002 when he began operating out of his house under his corporation Stack, Inc.  (p.515:20-p.516:11 Stack).

40.     About three years prior to the date of the '488 patent, Stack and John began developing a new process for making integrated cards and they ran tests of the card at the company that manufactures the Profiteer press.  (p.520:11-19, p.522:12-24, 528:3-23 Stack).

41.     Stack's company Business Forms Sales sold this type of integrated card to the Chicago Art Museum.  (p.521:4-8 Stack).

42.     Stack and John formed Tri-Graphics to sell an integrated card pursuant to the '488 patent, John supervised the manufacturing process and they developed a marketing plan to competitively price the card based on their experience in the industry.   (p.530:7-p.531:22, p.534:2-p.535:11 Stack).

43.     If a money judgment is assessed against USA in this suit, Stack will receive 42% of the judgment after legal fees are paid.  (p.552:4-9 Stack).

### C.     John/Stack Had Actual or Constructive Knowledge of the Accused Product

44.     At least as early as 1996, John knew that United Stencil & Affixing Co., Inc. was known in the industry as USA.  (p.235:23-p.236:8 Wooley).

45.     At least as early as 1996, John knew that USA made integrated cards.  (p.236:25-p.238:2, p.244:18-p.245:3 Wooley).

46.     In 1996, John repeatedly asked Brian Wooley what products USA made, how much work they had and the type of machinery it used.   (p.235:19-p.236:14, p.238:1-12 Wooley).

47.     In 1996, Chuck Casagrande worked for Precision Coated Products, which sold a laminate called Lite Lift Dry used only to make integrated cards.  (p.248:3-p.249:3 Casagrande).

48.     In 1996, Casagrande made a sales call on John at Tri-Graphics as a result of a phone call from John to Casagrande asking for a quote for laminate to produce integrated cards.  (p.249:10-p.250:11, p.252:1-3, p.300:17-21 Casagrande; p.243:15-17 Wooley).

49.     During Casagrande's sales call on John in 1996, Casagrande showed John a sample book.  (p.252:15-24 Casagrande).

50. During the sales call, Casagrande showed John two integrated cards made by USA, pulled out these integrated cards and peeled them apart with John. These integrated cards are Defendant's Exs. 31 and 31A. (p.273:5-p.275:8 Casagrande).

51. John Walter McKillip (JW) USA's Vice-president of Sales, attended the DMIA trade show in Baltimore in October, 1998 and worked at USA's booth. It was a double-sized booth with signs advertising its integrated cards and samples of its integrated cards on display. (p.341:9-11, 21-p.342:18 JW).

52. At the 1998 Baltimore trade show, John visited USA's booth, spoke to JW and asked for a USA sample pack. JW gave him a sample pack, which included the type of USA integrated card at issue, Defendant's Ex. 16. (p.342:25-p.344:4 JW; p.370:2-8 Storjohann).

53. When JW talked to John at the USA booth at the 1998 Baltimore trade show, JW noticed that John had used his business card to cover the name printed on the original badge he wore on his lapel. (p.344:5-14 JW).

54. Every now and then Stack attended a DMIA trade show using a visitor pass someone gave him. (p.549:8-22 Stack).

55. According to the DMIA representative, it is common for people to walk into its trade shows without having to show an ID and people have traded badges to obtain access to the show. (Marj Green Dep. Designations p.46:16-p.47:9).

56. It was not unusual for there to be errors in the billing entries of John's attorney Campanale, including those for October, 1998. The October 8, 1998 entry designated "in-office" was not an "in-office" event, John did not go to court with him on most occasions and the likelihood that John actually appeared at court on that date is less than 50% at best. (Campanale Dep. Designations p.12:18-24, p.13:1-24, p.14:1-4, 12-17).

57. John attended the following industry trade shows:

- Prior to 1989, the NBFA trade show in Chicago and a Tabletop show in Minnesota (p.365:23-p.366:20 Storjohann)
- 1998 Annual DMIA show in Baltimore, MD (p.342:25-344:4 J.W).
- 1999 DMIA show in St. Louis, MO (p.491:23-492:10 Maria McKillips).
- March, 2000 Tabletop show in Rosemont, IL (p.215:12-21 St. Onge)
- 2000 Annual DMIA show at Rosemont Expo Center (p.220:18-p.221:2 St. Onge)
- June, 2001 TradeMart show in Chicago area (p.221:10-15 St. Onge)

- October, 2001 Annual DMIA show in Philadelphia, PA (p.451:25-453:2 John; p.221:13-21 St. Onge)
- 2002 Tabletop show in Oakbrook, IL (p.421:3-10 John)
- October, 2002 Annual DMIA Show in Rosemont, IL (p.423:1-12 John; p.221:22-p.222-21 St. Onge)
- 2003 Annual DMIA Show (p.221:22-p.222-21 St. Onge)
- 2004 Annual DMIA Show (p.221:22-p.222-21 St. Onge)

58.     USA attended and displayed its products, including its integrated cards, at these 8 annual trade shows and at least these 3 TradeMart/Tabletop shows in the Chicago area, which John also attended.  (Stip. No. 32; Def's Ex. 17; p.72:21-76:4, p.78:13-20 Steve; p.350:2-10,24,p.351:6,13-18 JW; p.200:23-p.222:21 St. Onge; p.365:23-p.366:20 Storjohann).

59.     John attended the 1999 DMIA show in St. Louis, MO with his wife Maria, who stated that like any trade show, "You go around the entire area visiting all the stations." (p.491:23-p.492:10 Maria McKillip).

60.     John attended every national trade show from at least 2000 through 2005 and attended a seminar on integrated cards at the March, 2000 show.  USA also attended and displayed its products at each of these shows.  (p.220:23-p.222:21 St. Onge; p.72:21-76:4 Steve; p.350:2-10, 24-p.351:6 JW; Def's Ex. 17; Stip. No. 32).

61.     When John attended the 2000 Annual DMIA show at the Rosemont Expo Center, he also attended a seminar on integrated cards conducted by Libman Business Forms.  (p.220:23-221:7 St. Onge).

62.     United Stencil & Affixing and USA/Docufinish was always known in the industry as USA.  (p.341:17-20 J.W.; p.364:11-21 Storjohann).

63.     Integrated Label Corp. has been a member of the DMIA since July, 1999 and is listed in the October, 2002 Print Solutions magazine as a source for integrated cards, along with U.S.A., Specialty and AmeriPrint.  (p.419:9-421: p.2 John; Def.'s Ex. 23, Oct. 2002 Print Solutions tab, at p.39, 291, 362).

64.     When John attended industry trade shows he chose not to look at other companies' booths and displays.  He just looked at the girls when he walked around the trade shows.  (p.453:12-p.454:13 John).

65.     When Stack attended DMIA trade shows in the Chicago area he saw Steve McKillip and United Stencil and its booth at shows he attended. (p.536:20-p.537:12 Stack).

66.     After American Stencil went out of business around 1997 or 1998, Stack began doing business with United Stencil, later known as USA, on behalf of Business Form Sales and received mailings from USA. (p.540:13-p.541:6 Stack).

67.     On March 26, 1999 Stack prepared a handwritten purchase order that he addressed to USA for stencils. (Def's. Ex. 20; p.541:16-p.542-16 Stack).

68.     In 2001, USA sent two different quotes to Stack at Business Forms Sales for integrated cards. The quotes were requested by Stack. (p.70:3-p.71:3 Steve).

69.     Def's. Ex. 21 contains June 27, 2001 quotes from USA for integrated cards sent to the attention of Stack and Business Form Sales and Stack received these quotes. (p.543:3-p.546:16 Stack).

### D.     John Policed His Other Patents But Not the '488 Patent

70.     In 1996, John told Wooley that he had lawsuits going and was suing people. (p.240:25-241:5 Wooley).

71.     Specialty Tape and Label (Specialty) first started making a thumb notch card in the late 1990's, as reflected in Defendant's Ex. 1. John came up with the idea for this card. (p.303:4-13, p.304:1-8 Paveza; p.400:1-9 John).

72.     John filed a patent application for the thumb notch card in October, 1999 and the patent was issued in December, 2003. (p.400:5-401:2 John; Def.'s Ex. 5).

73.     John told Al Paveza, the President of Specialty, that he had a patent application for the thumb notch card. Specialty paid John royalties on its sales of the thumb notch card. (p.304:11-17 Paveza; p.401:3-22 John).

74.     Before Specialty began making the thumb notch card, it was making an integrated card, (Def.'s Ex. 3) of the same type as the USA integrated card at issue, (Def.'s Ex. 16). Specialty started making this card in the late 1990's and has continued to make it over the years. (p.305:18-p.306:17, p.308:6-12, p.311:8-23 Paveza).

75.     Paveza considers Defendant's Ex. 3 the same type of card as Def.'s Ex. 16. (p.340:10-12 Paveza).

76.     John saw Specialty making the type of integrated card contained in Def.'s Ex. 3 on its press. (p.403:11-404:18 John; p.308:22-p.309:5, p.311:8-23 Paveza).

77. Around 2002, John told Paveza that he had a patent pending on the type of card reflected in Def.'s Ex. 3. Specialty continued to make this card and John knew this. (p.308:22-p.309:5, p.311:8-23 Paveza).

78. John told Paveza that when he got the patent for the integrated card of the type reflected in Def.'s Ex. 3, he would give Specialty the first chance to license it. Paveza told him to let him know when the patent issued. (p.309:24-p.310:18 Paveza).

79. The application for the '488 patent was filed in May, 1994 and the patent was issued in October, 1995. (Pl's. Ex. 1).

80. John assisted his wife in started Integrated Label Corp. in July, 1999. (Stip. No. 29).

81. Def.'s Ex. 2 is an integrated card specially made pursuant to the '488 patent for Integrated Label Corp. A customer had called John asking for an integrated card and wanted to have two integrated labels as well. John told Specialty how to do it and Specialty made the card contained in Def.'s Ex. 2 for a customer of Integrated Label Corp. (p.405:10- p.406:24 John).

82. Defendant's Ex. 38 is an invoice for integrated cards made pursuant to the '488 patent ordered by Integrated Label Corp., made by Specialty and shipped to Uncommon Goods. This October 10, 2003 invoice is the second order Integrated Label Corp. placed with Specialty for this type of integrated card. Specialty was not paying John a royalty for making this card at this time. (p.313:12-15, p.314:1-23, p.316:12-14 Paveza; p.406:9-407:24 John).

83. The Specialty ad contained in the August, 2002 Print Solutions magazine, which referenced a patent issued for integrated cards, refers to John's '488 patent. (p.411-p.417 John; Def.'s Ex. 1).

84. Specialty did not sign a license agreement with Malessa Partners to make an integrated card pursuant to the '488 patent and pay it a royalty of 5% until September, 2006, as reflected in Def.'s Ex. 6. (p.312:7-16 Paveza; p.409:14-22 John).

85. At the 2002 Tabletop show John attended in Oakbrook, IL, although he registered under the name Integrated Label Corp. he attended to work at the Specialty booth to promote integrated labels because he received royalties on those labels. (p.422:7-22 John).

86. John directed Malessa Partners to file claims alleging infringement of his patents for Integrated Labels against AmeriPrint and other companies in December, 2002. (p.433:14-437-36:9 John).

87.     On March 8, 2003 Specialty entered into a license agreement with Malessa Partners for two of John's patents related to integrated labels, as reflected in Def.'s Ex. 7.  At the time, John told Paveza that he had a patent on integrated labels and that he was going to go after other people and that he would give Specialty a preferable deal on the integrated cards now that the patent was on the verge of being issued.  (p.328:16-p.330:25 Paveza).

88.     John filed articles of incorporation with the State of Illinois for the name United Stencil & Affixing Company, Inc. knowing that his brother Steve was operating a company under this name.  He never intended to use the name but filed it because he could.  While he signed the document under penalty of perjury, he probably did not read it before signing it. (p.454:14-p.455:23, p.456:23-p.457:16, p.458:23-p.459:3, 463:12-24 John; Def's. Ex. 9).

89.     In January, 1987 John sent a letter to Mason Marking Systems advising it that the name United Stencil & Affixing is registered to John.   (p.463:25-p.464:2, p.466:6-23 John; Def's. Ex. 10).

90.     In 1993, John sued his brother Steve's company, United Stencil & Affixing for infringement of a patent he had for a stencil.  (p.466:24-p.467:3 John).

91.     After John sued his brother for patent infringement in 1993 he continued to invent business forms products and is listed as the inventor on nine subsequent patents but never made any effort to check on what USA was selling because he could care less.  (Def's. Ex. 5; p.467:14: p.469:2 John).

92.     Stack considered himself a silent owner of the patent and let John decide how to proceed with enforcement of the patent.  (p.563:4-9 Stack).

93.     In February, 2002 John sold his 4100 Grand Avenue property for $945,000. (p.635:12-p.636:3 John).

**E.     The Accused Integrated Card Product was Easily Testable for Infringement**

94.     Samples of USA's integrated card products could be easily obtained at any time by just calling up and asking USA, picking up samples at one of the hundreds of trade shows where USA exhibited, through samples in trade publications or sent in an informational booklet, such as Defendant's Exh. 22 through a mailing list.  (p.89:14-p.91:21 Steve).

95.     Several witnesses were able to examine a product sample of an integrated card, such as Defendant's Exh. 16, and identify it as an integrated card, including such features as die-

cutting, adhesive patch and other particulars. E.g., (p.39:17-p.42:22 Steve; p.369:15-22 Storjohann);

96.     John can tell if a product is potentially covered by the '488 patent by checking the front to see if there is a die cut and taking off the back to see how many films there are. If there is a film on the card and also a film remaining on the back of the form then he would take it to his patent attorneys for further evaluation. (p.592:19-p.593:16 John).

## F.     USA Reasonably Relied on the Misleading Conduct of Integrated

97.     Although John had sued USA for patent infringement in 1993, neither John, Stack or any other representative of Integrated ever contacted Steve or USA or threatened to sue Steve or USA for infringement of the '488 Patent until 2005. (p.65:25-p.66:9 Steve).

98.     Steve testified as to his knowledge of the '488 patent and his understanding of its scope relating to integrated cards. He had also read the patent several times and heard about it in the 1990's from Brian Wooley and Chuck Casagrande. (p.58:16-p.59:19; p.60:10-p.61:6; p.62:25-p.63:14 Steve).

99.     Steve attended the Tri-Graphics auction in 1997 where he saw the '488 patent on display and heard the auctioneer describe it when he offered it for bid. Steve spoke to both John and Stack at this auction. (p.64:6-p.65:24 Steve; Def's Ex. 19).

100.    When Stack attended the Tri-Graphics auction in 1997 he saw Steve, talked to him and assumed he knew what the '488 patent consisted of. (p.538:22-p.540:12 Stack).

101.    Because of this silence from Stack and John, and his knowledge of and past experience with being sued years earlier by John for patent infringement on another patent, Steve believed that he was free to continue making integrated products at USA without threat of suit from Integrated. (p.67:13-p.69:7; p.128:22-p.129:16 Steve).

102.    The construction of USA's integrated card has not changed since it began making them in 1995. Steve considered changing the construction of USA's integrated card product after this lawsuit was filed. (p.50:10-p.51:7 Steve).

## G.     Evidentiary Prejudice

103.    Josephine Pacheco, an official with Banco Popular, testified as to the existence of bank accounts in John J. McKillip's name that existed in the late 1990's and closed in the years 1999 and 2000, as shown in Defendant's Exh. 46. (p.657:18-p.658:12 Pacheco). Ms. Pacheco

could not examine details of these accounts because more detailed records would only be kept by the bank for seven (7) years. (p.662:5-14 Pacheco).

104.    Prior art or other evidence that may bear on the validity of the patent-in-suit going back prior to 1995, including evidence as to exactly when USA began making its integrated cards such as Defendant's Exh. 14, has been difficult to locate. (p. 45:19-23; p.122:15-p123:25 Steve).

105.    Steve McKillip was recently diagnosed with Alzheimer's Disease, a disorder that may affect his memory in the near future. (p.16:2-17 Steve).

106.    Steve testified that detailed financial documents relating to investments in integrated cards by USA (including advertising, marketing, machinery investment and sales) that go back as early as 1995 are no longer available even though they did once exist. Steve testified that it was expensive for a small company to store such records for so many years. (p.48:15-p.49:12; p.113:1-13; p.115:17-23; p.121:14-p.122:14 Steve)

107.    It is more likely that Casagrande would have had the actual sample book he showed John in 1996 if he were asked for it ten years earlier. (p.300:22-25 Casagrande).

108.    John did not have all of the DMIA publications he received prior to September, 2003 because they were received so long ago. (p.444:1-13 John).

109.    Around 2002 Stanley Stack was diagnosed with hypoparathyroid disease, which caused a loss of memory. (p.516:20-p.519:21 Stack).

110.    With respect to the specifications for a quote for integrated cards that Stack asked USA to provide, he cannot recall the details because it was a long time ago and he does not have his fax to USA asking for quotes because he does not have any records any more. (p.547:19-p.548:23 Stack).

111.    Stack does not recall when he and John started developing the integrated card, when John made the trip to a Kansas City customer that triggered the idea for the card or the date when his company made this type of card for the Chicago Art Museum. He did not keep records of what this customer asked him to make because he was not required to keep records after seven years. (p.521:4-p.522:13, p.525:6-21, p.527:5-9 Stack).

**H.** **Economic Prejudice – USA Changed its Economic Position in the Nearly Ten Years Since Integrated Knew or Should Have Known About its Integrated Card Products**

112. USA spent tens of thousands of dollars over the years promoting its integrated card products through direct mailings and other promotion materials, including binders, information sheets (such as Defendant's Exh. 22) and product samples. (p.89:1-p.91:13; p.92:1-8 Steve; p.352:19-p.356:9 John).

113. USA spent tens of thousands of dollars over the years advertising its integrated card products in trade publications such as those in Defendant's Group Exh. 23. (p.79:10-p.89:12; p.91:23-p.92:20 Steve).

114. USA spent tens of thousands of dollars over the years exhibiting at many large and small trade shows throughout the country, as shown in Defendant's Exh. 17. (p.72:71-p.79:8; p.98:2-p.99:21 Steve; p.349:8-p.352:2 John). At these shows, integrated card products were prominently displayed and samples of integrated cards were given away. (p.78:13-20 Steve). Further, registration costs such as those listed in Defendant's Exh. 17 do not account for significant related costs such as travel and lodging. (p.98:6-11 Steve).

115. Since 1995, USA has invested in expensive machinery (as described in Defendant's Exs. 7-10) and made related expenditures to produce integrated cards and increase capacity. (p.102:16-p.105:21; p.107:1-p109:12; p.110:8-p.112:22; p.118:5-p.119:12 Steve; p.356:10-22 John).

116. The additional machinery purchased by USA increased capacity to produce integrated cards, which in turn allowed USA to "go out and sell to [USA's] capacity", "go after larger applications . . . to be able to accommodate them." This caused an eventual increase in the sales of its integrated cards products. (p.356:10-p.357:9 John).

117. Steve testified that had USA been sued earlier on the '488 patent, it would have considered stopping the selling of integrated cards entirely. (p.102:11-13; p.120:17-19 Steve).

118. While the machinery and promotion materials also promoted and manufactured USA's other products, if USA had not promoted its integrated card products in such materials, USA could have devoted more of these resources to increasing sales and capacity of its other products instead of integrated cards. (p.352:3-8 JW).

119. If USA was not making integrated cards, it would not have needed to purchase so many machines having the capability to make integrated cards. (p.109:12-18; p.119:13-p.120:10

Steve).  "If I didn't make the integrated cards, I wouldn't have a need for all this equipment." (p.120:11-19 Steve).

120.    John W. McKillip, VP of sales for USA and an employee of USA since 1997 (p.341:1-11 JW), testified that between 1997 and 2006, sales of USA's integrated cards have increased.  He had knowledge of this as a commission-based salesman for USA who tracked sales on a regular basis.  (p.348:9-22 JW).

121.    Steve testified that Defendant's Exh. 24 also showed increased sales from 1998-2006 for integrated cards.  (p.125:10-p.126:18 Steve).

122.    The sales increase for integrated cards over the years, as shown in Defendant's Exh. 24, has been due to USA's marketing and excellent quality of its products (p.127:12-p.128:15 Steve), and to significant investments made by USA in marketing, advertising and equipment.  (p.357:2-9 JW).

123.    Had USA not sold or promoted its integrated card products, its investments in marketing, advertising and equipment would have decreased or otherwise would have been reallocated to other products in USA's product line.  (p.352:3-p.353:5 JW; p.101:9-15 Steve).

124.    The amount USA spent on advertising would have been different had USA been sued for infringement of the '488 patent years before.  (p.101:13-p.102:10 Steve).

### I.      John Testified Falsely Throughout this Litigation

125.    John testified that he never purchased anything from Mr. Casagrande despite invoices from Casagrande of Precision Coated Products to Tri-Graphics dated November and December, 1996.  (p.591:6-11 John; Def's. Exs. 32-24; p.276:8-p.278:2 Casagrande).

126.    After testifying extensively at trial that he was one of the principals of Tri-Graphics, the method he used at Tri-Graphics to make products and that he provided direction to the pressmen, John later denied this and stated he was just a landlord for Tri-Graphics and that his testimony about making integrated cards related to American Stencil instead.  (p.397:10-p.399:18, p.606:13:608:10 John).

127.    John testified that he did not attend the DMIA trade show in Baltimore held October 7-10, 1998, that he had no personal bank accounts or credit cards in 1998 and did not owe state or federal income tax in 1998.  (p.608:23-25, p.610:6-7, p.611:6, p.613:9, p.614:16-23, p.615:13-20 John).  Defendant's Ex. 46 reflects that John had an account in his name at Banco Popular opened on February 17, 1998 and closed on August 18, 2000 and that John also had an

account with his wife at the same bank opened in July, 1994 and closed in June, 1999. (p.657:18-p.658:9 Pacheco).

128.     The payroll checks issued by AmeriPrint to John reflected in Defendant's Ex. 43 were deposited or cashed by John at Banco Popular in September and November, 1998. (p.658:21-p.659:4; p.662:17-p.663:2 Pacheco).

129.     In 1998, John had credit cards in his name with DMCCB and Capital One. (Def's. Ex. 11 at p. 18; Janice Fogleman Dep. Designations re authentication).

130.     John testified that the AmeriPrint payroll checks he received in 1998 were deposited into a Banco Popular account for the 4100 Grand Avenue building but the check register for the 4100 Grand Avenue building for 1998 shows an account at First Star.  (p.613:12-p.614:3. p.634:11-17 John.)

131.     John was aware that Specialty was making a label for Cook County hospitals, as reflected in Defendant's Ex. 40.  This product is marked with the '488 patent number but is not an integrated card.  (p.332:9-14; p.334:3-18; p.335:17-p.339:4 Paveza).

## II.     CONCLUSIONS OF LAW

### A.     <u>Laches And Estoppel</u>

1.     Laches is cognizable as an equitable defense to a claim of patent infringement. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed.Cir.1992) (en banc).

2.     Laches may exist where the plaintiff's neglect or delay in bringing suit, taken together with lapse of time and other circumstances, causes prejudice to the defendant and operates as an equitable bar.  *Id*. at 1028-29.  "Laches focuses on the dilatory conduct of the patentee and the prejudice which the patentee's delay has caused." *Id*. at 1031-32.

3.     To successfully invoke the laches defense to a patent infringement suit, a defendant has the burden to prove two factors: first, that the plaintiff delayed in filing suit for an "unreasonable and inexcusable" length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant; and, second, that the defendant suffered "material prejudice attributable to the delay."  *Id*. at 1032.

4.     Laches is based on the maxim that "equity aids the vigilant, not those who slept on their rights."  *Odetics, Inc. v. Storage Tech. Corp.*, 919 F.Supp. 911, 917 (E.D. Va. 1996).

5.      Courts have repeatedly held for over a century that equity will not assist one who has slept on its rights and shows no excuse for its delay in asserting them. *A.C. Aukerman*, 960 F.2d at 1029 (*citing Lane & Bodley*, 150 U.S. 193, 201 (1893)).

6.      An unreasonable length of time has no fixed boundaries, and this Court must look at the facts and surrounding circumstances of the case and weigh the equities. *A.C. Aukerman*, 960 F.2d at 1032; *Rosemount, Inc. v. Beckman Instruments*, 727 F.2d 1540, 1550 (Fed. Cir. 1984) (denying the patentee damages because of a three-year delay). However, a delay exceeding six years creates a presumption of laches.

7.      Under the presumption, a *prima facie* defense of laches is made out upon proof by the accused infringer that the patentee delayed filing suit for six years after actual or constructive knowledge of the defendant's acts of alleged infringement. *A.C. Aukerman*, 960 F.2d at 1037; *Naxon Telesign Corp. v. Bunker Ramo Corp.*, 686 F.2d 1258, 1263 (7th Cir. 1982).

8.      The six year presumption places a burden of production on the patentee. Where the patentee fails to come forward with either affirmative evidence of a lack of prejudice or a legally cognizable excuse for its delay in filing suit, the two facts of unreasonable delay and prejudice must be inferred. *Hall v. Aqua Queen Mfg.*, 93 F.3d 1548, 1554 (Fed. Cir. 1996).

9.      As the Supreme Court explained, "Where the question of laches is an issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Johnston v. Standard Mining Co.*, 148 U.S. at 370; *See also, Wanless v. General Elec. Co.*, 148 F.3d 1334, 1337-38 (Fed. Cir. 1998). Put another way, ignorance will not insulate a patentee from constructive knowledge of infringement in appropriate circumstances. *Wanless*, 148 F.3d at 1338.

10.     As a co-owner of the '488 patent during at least part of the delay period, Stanley Stack's actual knowledge of USA's integrated card product is imputed to Integrated and he is charged with such knowledge as he might have obtained upon inquiry, just as is John. *Johnston*, 148 U.S. at 370.

11.     Equitable estoppel is an equitable defense to infringement and may serve as an absolute bar to a claim of patent infringement. *A.C. Aukerman. Co. v. R.L. Chaides Construction*

*Co.*, 960 F.Supp. 1020, 1041 (Fed. Cir. 1992) (en banc). In order for an alleged infringer to bar a patentee's suit by means of equitable estoppel, it must establish:

(1)     That the patentee, through misleading conduct, led the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent;

(2)     the alleged infringer relied on that conduct; and

(3)     due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim.

*Aukerman*, 960 F.2d at 1028. Unlike laches, equitable estoppel does not require the passage of "an unreasonable period of time before filing" suit.

12.     A patentee's *inaction* can constitute "misleading conduct" when coupled with other factors. *Aukerman*, 960 F.2d at 1042. As the Federal Circuit explained in *Scholle Corp. v. Blackhawk Modeling Co., Inc.*, 133 F.3d 1469, 1473 (Fed. Cir. 1998), conduct by the stopped party need not comprise affirmative misstatements.

13.     Rather, such conduct may include inaction or silence where there was an obligation to speak. In *Stryker Corp. v. Zimmer, Inc.*, 741 F.Supp. 509 (D. N.J. 1990), the court granted defendant's summary judgment motion based on the doctrines of laches and, equitable estoppel. The patentee argued that the "intentionally misleading silence" cases should not apply since there was no threat of infringement. The court soundly rejected the contention that an actual threat of infringement was necessary, explaining that the lack of a threat *actually bolsters* the estoppel defense:

> But nowhere is it said that there *must* be a threat of enforcement or an assertion of rights followed by silence before there can be an estoppel. Indeed, where *nothing* has happened other than silence so misleading that the infringer believes the patentee has abandoned its claims, more reason exists for finding an estoppel than where a threat or an assertion of rights has, in fact, been explicated. A patentee who asserts its rights and then does nothing has at least initially put an alleged infringer on "notice that something might be amiss which "something" it may, for whatever reason, not chose to pursue expeditiously. A patentee who, with knowledge of the alleged infringing activity, does nothing over a period of years other than mislead a purported infringer and those who have gone before to believe that there was and is no problem, lying in wait until, as Zimmer's counsel put it at oral argument, it has become "commercially and economically worthwhile" to do something, has engaged in the affirmatively misleading silence

of the worst order and should. not be insulated merely because... for whatever reason, it did not articulate a threat or assert a right but, rather, chose to mislead from day one.

741 F.Supp. at 514.

### C. Unreasonable And Inexcusable Delay

14.     The length of time that may be deemed unreasonable has no fixed boundaries, but rather depends on the circumstances of the case. *Aukerman,* 960 F.2d at 1030; *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed.Cir.1995).

15.     The period of delay is measured from the time plaintiffs knew or in the exercise of diligence reasonably should have known of the defendant's alleged infringing activities to the date of suit. *Aukerman,* 960 F.2d at 1032.

16.     The availability of delay based on constructive knowledge of the alleged infringer's activities imposes on patentees the duty to police their rights. *Wanless v. Gen. Elec. Co.,* 148 F.3d 1334, 1338 (Fed.Cir.1998).

17.     Sales and marketing of a product similar to or embodying technology similar to the patented invention gives rise to a duty to investigate whether there is infringement. *Id.* Constructive knowledge may be based on pervasive, open, and notorious activities in the industry. *Hall*, 93 F.3d at 1553.

18.     Constructive knowledge of infringement is imputed to a patentee if the activities are sufficiently prevalent in the inventor's field of endeavor. *See, e.g., Wanless v. General Elec. Co.*, 148 F.3d 1334, 1337-38 (Fed. Cir. 1998); *Beam Laser Systems, Inc. v. Cox Comm'ns, Inc.*, 144 F.Supp.2d 464, 468 (E.D. Va. 2001); and *A.R. Mosler & Co. v. Lurie*, 209 F. 364, 370-371 (2nd Cir. 1913).

19.     Integrated cannot deliberately choose not to investigate or shut its eyes to what was going on in the industry for years at a time. One cannot be willfully or negligently oblivious to the activities of others in the industry as a way of avoiding constructive knowledge. *A.R. Mozler & Co*., 209 F.3d at 370-371; *Beam Laser Systems, Inc., v. Cox Comm., Inc*., 144 F.Supp.2d 470-472; *Wanless* 148 F.3d at 1338.

### D. <u>Reliance</u>

20. Expansion of the defendant's business may be evidence of detrimental reliance and prejudice. *See Advanced Hydraulics, Inc. v. Otis Elevator Co.,* 525 F.2d 477, 481 (7th Cir.1975).

21. "The longer the delay, the stronger the inference [that the patentee has abandoned its claim] becomes." *A.C. Aukerman*, 960 F.2d at 1044.

### E. <u>Prejudice</u>

22. Material prejudice to USA resulting from plaintiff's delay in bringing suit may be either economic or evidentiary. *A.C. Aukerman,* 960 F.2d at 1033.

23. Within the context of trademark law, many courts have held that the longer the delay, the less need there is to show specific prejudice resulting from the delay. *Bridgestone/Firestone Research v. Auto. Club*, 245 F.3d 1359, 1363 (Fed. Cir. 2001); *see also*, *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 821 (7th Cir. 1999) (holding that less proof of prejudice was required when the plaintiff waited ten to twenty years prior to filing suit).

24. The Federal Circuit has also applied this "sliding scale" approach in the context of patent law. In *Leinoff v. Louis Milona & Sons, Inc*., the Federal Circuit stated that "[t]he law is well settled that in order to assert the defense of laches, the defendant must prove . . . material prejudice to the defendant resulting from this delay, but the longer the delay, the less need there is to show specific prejudice." 726 F.2d 734, 741 (Fed. Cir. 1984), *overruled on other grounds by A.C. Aukerman*, 960 F.2d 1020 (Fed. Cir. 1992).

25. District courts have also followed this maxim set forth in *Leinoff. See Dentsply Int'l Inc. v. Sybron Corp*., No. 84 C 3822, 1986 WL 5757, at *2 (N.D. Ill. May 12, 1986) ("[T]he longer the delay the less need there is to show specific prejudice" with respect to plaintiff's seventeen-year delay); *see also Soot v. General Elec. Co*., 681 F.Supp. 157, 163 (S.D. N.Y 1987) (noting that a lesser showing of specific prejudice was required because the plaintiff waited eight years to bring the action).

26. Further, courts have held in other trademark cases that a prolonged delay gives rise to a **presumption** that the alleged infringer was prejudiced. *Dymo Industries, Inc*., *supra at* 415. *See also *1182; *Baker Mfg. Co. v. Whitewater Mfg. Co.*, 430 F.2d 1008 (7th Cir. 1970),

cert. denied, 401 U.S. 956, 91 S.Ct. 978, 28 L.Ed.2d 240 (1971); *Whitman v. Walt Disney Productions*, 263 F.2d 229 (9th Cir. 1958); and *Jones v. Ceramco, Inc.*, 387 F.Supp. 940 (E.D.N.Y.1975), *aff'd*, 526 F.2d 585 (2d Cir. 1975).

### 1.    *Evidentiary Prejudice*

27.    "Evidentiary, or 'defense' prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *Aukerman,* 960 F.2d at 1033.

### 2.    *Economic Prejudice*

28.    Economic prejudice arises when a defendant suffers the loss of monetary investments or incurs damages that likely would have been prevented by earlier suit. *Id.* at 1033. The defendant must prove the existence of a nexus between the patentee's delay in filing suit and the expenditures. *Hemstreet v. Computer Entry Sys. Corp.,* 972 F.2d 1290, 1294 (Fed.Cir.1992).

29.    The Federal Circuit has repeatedly emphasized the importance of the fact that the alleged infringer must have changed its position "because of and as a result of the delay." *State Contracting & Eng'g Corp. v. Condotte Am., Inc.,* 346 F.3d 1057, 1066 (Fed.Cir.2003) (quotation omitted); *see also Gasser Chair,* 60 F.3d at 773 ("We reiterate that a change in the economic position of the infringer during the period of delay must be as a result of the delay; the infringer must prove that the change in economic position would not have occurred had the patentee sued earlier").

30.    Resources spent on marketing and development costs associated with products manufactured with the patented process can demonstrate that defendant suffered material prejudice based on patentee's delay in filing suit. *See Melea Ltd. v. Quality Models Ltd*., 345 F. Supp. 2d 743, 756 n.6 (E.D. Mich. 2004).

31.    An increase in sales, and the fact that the infringer may have designed around, is sufficient for a showing of material prejudice. *ABB Robotics v. GMFanuc Robotics Corp.*, 828 F. Supp. 1386, 1396 (E.D. Wisc. 1993).

32.     Even if only a part of the expansion during the delay period involved equipment allegedly infringing the patent-in-suit, such expansion is sufficient to show that the alleged infringer was materially injured.  *See Digital Systems Int'l Inc. v. Davox Corp.*, 1993 WL 664647, at *4 (W.D. Wash. July 1, 1993).


MCKILLIP INDUSTRIES, INC. d/b/a
USA/DOCUFINISH


By:   _____   /s/Michael P. Chu_____
                    One of Its Attorneys

Jacqueline A. Criswell
Tressler, Soderstrom, Maloney & Priess, LLP
Sears Tower - 22nd Floor
233 South Wacker Drive
Chicago, IL 60606
312/627-4000
312/627-1717 (fax)

Michael P. Chu
Brinks Hofer Gilson & Lione
455 North Cityfront Plaza Drive
Suite 3600
Chicago, IL 60611
312/321-4200
312/321-4299 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that, on this 17th day of April, 2009, the foregoing Proposed Findings of

Fact and Conclusions of Law of USA/Docufinish, was served by electronic filing on:


Steven C. Schroer
Mark W. Hetzler
Jon A. Birmingham
Fitch, Even, Tabin & Flannery
120 South LaSalle Street
Suite 1600
Chicago, IL 60603


_____ /s/Michael P. Chu