IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INTEGRATED CARDS, L.L.C, | ) | |
| | ) | Case No. 06 C 2071 |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| McKILLIP INDUSTRIES, INC. d/b/a | ) | |
| USA/DOCUFINISH, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff/Counter-Defendant Integrated Cards, L.L.C. ("Integrated Cards") brought this suit against Defendant/Counter-Plaintiff McKillip Industries, Inc. d/b/a USA/Docufinish ("USA"), alleging infringement of U.S. Patent No. 5,462,488 ("the '488 patent"), entitled "Integrated Card and Business Form Assembly and Method for Fabricating Same on Label Formation Equipment." On August 8, 2008, the Court denied USA's Motion for Summary Judgment on the basis of laches and equitable estoppel, finding that Integrated had raised triable issues of material fact regarding when it knew or should have known about USA's alleged use of the '488 patent. The Court bifurcated the defenses of laches and equitable estoppel and held a bench trial to resolve the disputed issues. After listening to the testimony presented by both parties and reviewing the documents entered into evidence at trial, the following constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

1

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I.   Background

John J. McKillip ("John") became involved in the business printing industry in the 1960s. (Stip. ¶ 1.) After getting his start in the industry selling business forms, he formed Illinois Stencil in the early 1970s, which merged with American Stencil in the late 1970s. (Stip. ¶¶ 7-9.) John hired his brother Stephen M. McKillip ("Steve") as a salesman at American Stencil, where the sales department comprised the two McKillip brothers. (Tr. Vol. 4-A, pgs. 582-83.) They worked together for a few years until 1986, when Steve unexpectedly and unamicably left American Stencil after getting into a dispute with John regarding sales calls. (*Id.* at 583-84.) John thought that Steve planned on starting a convenience store when he left American Stencil. (*Id.* at 584-85.) Instead, Steve started his own business printing company, United Stencil and Affixing, Inc. (*Id.*; Tr. Vol. 1-A, pg. 17.) Since 1986, Steve has served as president of United Stencil and Affixing, now named USA/Docufinish. (Tr. Vol. 1-A, pg. 17; Stip. ¶¶ 1-2.) Within the business printing industry, USA/Docufinish has always been known as "USA." (Tr. Vol. 2-B, pgs. 341, 364.) Unfortunately, the business printing industry was not big enough to hold both of the feuding McKillip brothers who have not spoken to each other in over twenty years. After Steve informed John in 1987 that he had started USA, the brothers stopped communicating with each other. (Tr. Vol. 4-A, pg. 585.) USA went on to take most of American Stencil's business. (*Id.* at 586.)

In 1993, John started another printing company, named Tri-Graphics, with his partners Stanley Stack ("Stack") and Bob VanHyfte ("VanHyfte"). (Stip. ¶¶ 10-11.) John began to use his knowledge of the business printing process to obtain ten patents for various types of business forms, labels and cards. (Def. Ex. 5.) At Tri-Graphics, John focused on research and development. (Stip.

¶ 10.) His efforts in that role paid off when he developed a method for integrated card assembly in 1994. (Stip. ¶ 12.) The term "integrated card" generally describes a business form that has a base document with an attached card that can be peeled away from the base document. (Stip. ¶¶ 4-5.) For example, a letter that has a peel-off membership card incorporated into it would be an integrated card. Not every type of integrated card has the same construction. (Stip. ¶ 4.) The '488 patent, issued to John and Stack on October 31, 1995, describes a specific type of integrated card that has a base document and a back patch. (Stip. ¶¶ 4, 5.) To make the integrated card described in the '488 patent, a die cuts the card shape into the base document, but not through the back patch, enabling someone to peel the card away from the remainder of the base document and the back patch. (Stip. ¶ 5.) Tri-Graphics began using the method described in the '488 patent to make integrated cards for its customers. (Stip. ¶ 13.) In 1997, American Stencil and Tri-Graphics each auctioned off their assets after their creditors forced them into bankruptcy involuntarily. (Tr. Vol. 4-A, pgs. 588, 591.)

Once American Stencil and Tri-Graphics ceased operations, John began selling business forms for AmeriPrint Corporation ("Ameriprint"), another business forms vendor. (*Id.* at 591-92; Stip. ¶ 24.) With John on board, AmeriPrint began selling integrated cards in 1998. (Stip. ¶ 25.) In July 1999, John left AmeriPrint and started Integrated Label Corporation ("Integrated Label") with his wife, where he has continued to work through the filing of this lawsuit in 2006. (Stip. ¶ 29; Tr. Vol. 4-A, pgs. 595-600.)

On September 29, 2005, John assigned his interest in the '488 patent to Malessa Partners, LLC ("Malessa"). (Stip ¶ 14.) In October 2005, Stack assigned his interest in the patent to his company, Stack, LLC. (*Id.*) Malessa and Stack, LLC then formed Integrated Cards, LLC and

3

assigned their interests in the '488 patent to the newly formed entity. (*Id.*) The sole members of Integrated Cards remain Malessa and Stack, LLC. (Stip. ¶ 15.)

Integrated Cards and USA each manufacture business forms, including integrated cards. (Tr. Vol. 1-A, pgs. 17, 19.) Since 1995, USA has continuously manufactured and sold integrated cards that allegedly infringe the '488 patent. (Stip. ¶ 6.) On April 12, 2006, Integrated Cards filed suit, claiming that USA's integrated card products infringe the '488 patent. The Court denied USA's Motion for Summary Judgment on the basis of laches and equitable estoppel, finding that disputes of material fact existed regarding when John had knowledge of USA's alleged infringement that could be imputed to Integrated Cards.

II.     Findings of Fact

The Court makes the following findings of fact after conducting a bench trial, observing the testimony of the witnesses, and assessing their credibility.

USA has manufactured the accused integrated cards since 1995. (Stip. ¶ 6.) To make integrated cards, USA purchased two Tamarack machines, a piece of equipment made primarily for the production of integrated cards and labels. (Tr. Vol. 1-A. pg. 102, 105.) In 1996, USA purchased a Tamarack machine for $266,000 to make integrated cards. (*Id.* at 108-09.) That machine was not sufficient for USA's integrated card manufacturing needs, so it purchased another Tamarack machine in January 1997 for $242,000 (*Id.* at 110.) In July 1997, USA purchased another Tamarack machine for $265,835 (*Id.*) USA now has four Tamarack machines that it uses nearly exclusively for producing integrated cards. (*Id.* at 104-05.) From 1998-99, USA purchased three FME machines that it uses to make integrated cards that have irregular form depths. (*Id.* at 103, 112.) The FME machines cost $100,000 each. (*Id.* at 112.) USA would not have had a need for the FME machines

if it did not manufacture integrated cards because it could have used other machinery to manufacture integrated labels of irregular depths. (*Id.* at 119-20.) USA's machinery purchases increased the company's total capacity to manufacture integrated cards and led to increased sales of integrated cards. (Tr. Vol. 2-B pgs. 356-57.) The construction of USA's integrated card products has not changed since it began making them in 1995. (Stip. ¶ 7.) USA would have considered abandoning production of its integrated card products altogether if Integrated Cards initiated this patent infringement suit in the 1990s. (Tr. Vol. 1-A pg. 102.)

Since it first started making integrated cards in 1995, USA has spent tens of thousands of dollars promoting its integrated card products using direct mailings and other promotional materials, such as binders, information sheets and product samples. (Tr. Vol. 1-A pgs. 89, 91-92; Tr. Vol. 2-B pgs. 352-56.) Additionally, USA invested tens of thousands of dollars since 1995 to participate in trade shows where it could exhibit its integrated cards. (Tr. Vol 1-A pgs. 72-79, 98-99; Tr. Vol. 2-B pgs. 349-52.) At trade shows, USA prominently displayed samples of integrated cards and gave away many samples to potential customers. (Tr. Vol. 1-A pg. 78.) As a result of its marketing efforts, including advertising, direct mailings, personal sales calls and trade shows, USA has steadily increased its sales of integrated cards since it began making them in 1995. (*Id.* at 127-28; Def. Ex. 24.)

In 1996, when John worked for Tri-Graphics, he supervised the company's production process. (Tr. Vol. 2-A pg. 233-24.) That same year, Tri-Graphics hired Brian Wooley ("Wooley") as a custom press operator. (*Id.* at 232.) Before starting at Tri-Graphics, Wooley had worked for USA for at least five years. (*Id.*) Soon after Wooley began working for Tri-Graphics, John asked him questions about other business printing companies. (*Id.* at 235.) For example, John asked

Wooley whether USA was busy, what type of machinery it used, and whether it made integrated cards. (*Id.* at 236-37.) Although Wooley refused to tell John about the type of machinery that USA used, he explained that USA made integrated cards, which he referred to disparagingly as "generic cards." (*Id.* at 237.) He further explained that USA made its integrated cards by using a machine to die cut a printed form and placing a patch on the back of the form. (*Id.* at 237-38, 245) John asked Wooley questions about USA's integrated cards "all the time," until Wooley became tired of the questions and told John that "if he has any questions about USA/Docufinish, why don't [sic] he just call Steve McKillip." (*Id.* at 238.)

In June of 1996, Chuck Casagrande ("Casagrande"), Vice President of Precision Coated Products, made a sales call to Tri-Graphics in response to John's request for quotes. (*Id.* at 243, 249.) Because Wooley used to work with Casagrande, when Wooley saw Casagrande at Tri-Graphics that day, he said hello and took a few minutes to catch up with Casagrande. (*Id.* at 243, 275.) Casagrande had developed a patent in 1995 for a laminate, named Lite Lift Dry, that customers used to create integrated cards. (*Id.* at 248.) Casagrande gave John a quote with three options for using Lite Lift Dry to produce integrated cards on his press. (*Id.* at 250, Def. Ex. 28.) He also gave him a sample book that contained various examples and samples of integrated cards that used the Lite Lift Dry laminate. (*Id.* at 252.) The sample book contained samples of integrated cards made by USA. (*Id.* at 252, 273.) One of the cards in the book that USA made had the letters "USA" on it. (*Id.* at 286.) John and Casagrande went through the sample cards page by page, peeling them apart to observe how the laminate worked. (*Id.* at 274.) In November and December 1996, Tri-Graphics bought the laminate. (*Id*. at 276-78, Def. Exs. 32-34.)

When John left Tri-Graphics for AmeriPrint in 1997, his primary responsibility was to promote integrated cards and labels. (Tr. Vol. 1-B pg. 188.) In that role, he prepared a business plan for AmeriPrint in January 1998. (*Id.*) The business plan explained trends in the business printing industry, indicating that manufacturers were trending towards making in-line integrated cards and labels. (*Id.* at 192.) The plan also included suggestions of strategies that AmeriPrint should pursue in selling integrated cards and labels. (*Id.* at 193). John was able to put the plan together only after researching the industry, observing the machinery that integrated cards manufacturers used and interviewing the major players in the business printing industry about how they produced their products. (Tr. Vol. 3-A pg. 429.) Specifically, he visited the Tamarack Company, manufacturers of one of the machines used to make integrated cards, in order to obtain information about the machinery and how people in the industry used the machinery. (*Id.*) As of 1997, when John began working for AmeriPrint, one of his responsibilities included promoting integrated cards and labels, which required him to understand AmeriPrint's competition within the business printing industry. Additionally, in January 1998, John prepared a business plan for AmeriPrint that explained how the integrated card industry worked, what AmeriPrint's competitors were doing and suggesting strategies for AmeriPrint to successfully sell its integrated card products. (Def. Ex. 8.) The business plan incorporated knowledge that he gained from a visit to the Tamarack Company, where he learned that competitors were using one of two machines to produce integrated cards. (Tr. Vol. 3-A pg. 429.)

To further its business, USA participates in the Document Management Industries Associations' ("DMIA") trade shows. (Tr. Vol. 2-B pg. 344.) Since 1997, USA has attended each national DMIA trade show. (*Id.*) Additionally, USA attends trade shows sponsored by its

distributor customers, such as American Solutions for Business, Performa and ASI. (*Id.* at 345.) In total, since 1997, USA has attended approximately 100 trade shows. (*Id.* at 350.) At the trade shows, USA displays its products, including integrated cards, and provides attendees with packets that include samples of the integrated cards it sells. (*Id.* at 344-45.) In October, 1998, the DMIA held a trade show in Baltimore, Maryland. (*Id.* at 341.) USA set up a 10' x 20' booth at the trade show to promote its products and to meet with its customers. (*Id.* at 341-42.) The booth contained several signs displaying USA's name and sample products, including integrated cards, labels and stencils. (*Id.* at 342.) John W. McKillip ("John W."), Steve's son and USA's Vice President of Sales, attended the trade show and worked USA's booth. (*Id.* at 341-42.) John W. had not had contact with his uncle, John, for many years. (*Id.* at 343.) While he was working at USA's booth, John came to the booth and introduced himself as John W.'s uncle. (*Id.*) The two men made small talk for few minutes about John W.'s mother and USA's business. (*Id.*) When they finished chatting, John asked John W. for a sample packet of USA's products. (*Id.*) John W. gave him a packet that included samples of USA's integrated cards. (*Id.* at 344.)

In 1999, when John left AmeriPrint, he helped his wife create Integrated Label. (Stip. ¶ 29.) Integrated Label became a member of the Document Management Industries Association ("DMIA") in July 1999. (Tr. Vol. 3-A pg. 442.) At that time, Integrated Label started receiving mailings from the trade association addressed to John, such as the monthly magazine Print Solutions and the Who's Who and Buyer's Guide publications. (*Id.* at 442-44; Def. Ex. 12.) The DMIA publications included a variety of advertisements for USA's products, including its integrated cards. (Stip. ¶ 33.) He used the information in the trade publications to create mailings to distributor lists as a part of Integrated Label's marketing strategy. (Tr. Vol 3-A pg. 447-48.) The letters claimed that Integrated

8

Label could manufacture integrated labels and integrated cards more economically than anyone else could. (Tr. Vol. 4-A pg. 620-24; Def. Ex. 36.) When he made those claims, he knew how the competitors in the industry made their integrated cards based upon his visit to Tamarack when he still worked at AmeriPrint. (Tr. Vol. 4-A pg. 620-24.) In March, 2000, John submitted a patent application to the U.S. Patent and Trademark Office, which indicated that he had been intimately involved in the business form industry for over twenty years. (*Id.* at 627-28; Def. Ex. 4.)

Individuals familiar with manufacturing integrated cards could easily test a particular integrated card sample for potential infringement of the '488 patent based on a brief visual inspection. (Tr. Vol. 4-A pgs. 592-93.) For example, to determine whether an integrated card infringed the '488 patent, John first looks at the front to see if a die cut is present. (*Id.*) Then, he looks to the back of the card to determine whether it has an adhesive film on it. (*Id.*) If he observes an adhesive film both on the back of the card and on the surface of the form that he pulled the card from, he sends the sample to his patent attorneys for further infringement testing because of the high likelihood that an integrated card with those characteristics infringes the '488 patent.. (*Id.*) During the course of the bench trial, the Court observed witnesses familiar with integrated cards perform the necessary inspection of an integrated card to test for infringement of the '488 patent in approximately twenty to thirty seconds. (Tr. Vol. 1-A pg. 39-42; Tr. Vol. 4-A pg. 592-93.)

II. Laches

Laches is an equitable defense that bars recovery by the plaintiff for any damages incurred before the initiation of the infringement suit. *See* 35 U.S.C. § 282; *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc). Laches requires proof that the patentee unreasonably and inexcusably delayed filing suit and that the delay caused material

prejudice to the defendant. *See Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998). A presumption of laches arises when more than six years has elapsed between the time the plaintiff knew or should have known of the alleged infringing activity and the time of filing suit. *See Aukerman*, 960 F.2d at 1028. When the presumption applies, courts infer unreasonable delay and prejudice from the length of the delay and the burden of going forward with the evidence shifts to the plaintiff. *See id.* When the presumption does not arise, the party claiming laches bears the burden of proving that: 1) the delay was unreasonable and inexcusable; and 2) the delay caused material prejudice. *See id.* The period of delay begins at the time the patentee had actual or constructive knowledge of the defendant's potentially infringing activities. *See Wanlass*, 148 F.3d at 1337. Because of the equitable nature of the defense, the question of whether laches applies lies within the sound discretion of the district court. *See Aukerman*, 960 F.2d at 1028.

Here, Integrated Cards filed suit against USA on April 12, 2006; therefore, if Integrated Cards had imputed knowledge of USA's potential infringement through John before April 12, 2006, the presumption of laches arises. As early as 1995, John had a suspicion that USA made integrated cards based on the questions he asked former USA employee Wooley about USA's products. Based on his conversations with Wooley, that same year, John obtained actual knowledge that USA produced integrated cards when Wooley informed him that USA made "generic cards." Although Wooley did not use the words "integrated cards" to describe USA's products, he told John that USA made its generic cards by using a machine to die cut a printed form and placing a patch on the back of the form. Based on John's extensive experience in the industry and expertise in the design of integrated cards, the description of USA's products that he received from Wooley put him on notice that USA made integrated cards. In 1996, he actually saw some of USA's integrated cards when

Casagrande provided them to him as samples for his Lite Lift Dry laminate. One of the cards even said "USA" on it. Although "USA" is an abbreviation for the United States of America, within the business document printing industry, USA/Docufinish has always been known as "USA." Additionally, after his conversations with Wooley, John knew that USA printed integrated cards. Therefore, the samples contained within Casagrande's sample book confirmed that USA made integrated card products as of 1996.

Not only did John see the integrated cards, he removed each of the cards in Casagrande's sample book from the forms to observe how the Lite Lift Dry laminate worked. That viewing allowed John to see whether the cards had an adhesive film on the back and on the form, giving him an opportunity to see if the cards, including the "USA" cards, potentially infringed the '488 patent. Because John looked at the cards in Casagrande's sample book for the purpose of evaluating how the Lite Lift Dry laminate worked with integrated cards, the inspection of USA's integrated cards in 1996 provided him with notice that USA's integrated card products potentially infringed the '488 patent. Because John had actual knowledge that USA produced integrated cards that potentially infringed the '488 patent in 1996 but did not file suit until 2006, the presumption of laches applies. Therefore, the Court infers that Integrated Cards unreasonably delayed the initiation of this suit and that the unreasonable delay caused USA prejudice.

Prejudice can take the form of either economic or evidentiary prejudice. *See Aukerman*, 960 F.2d at 1033. Economic prejudice arises when "a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *Id.* In evaluating whether economic prejudice exists, courts "look for a *change* in the economic position of the alleged infringer during the period of delay." *Id.* (emphasis in original). Here, USA

11

made extensive investments in its integrated cards products during the period of delay. Between 1996 and 1999, USA purchased three Tamarack machines and three FME machines at a total price of $1,073,835 to produce integrated cards. If Integrated Cards had claimed that USA infringed the '488 patent in the 1990s, USA would have stopped producing integrated cards because it had not invested much money in the products at that time. If USA had not produced integrated cards during that time, it would not have needed to purchase all of the machinery that it purchased during the delay period. For example, if USA only produced integrated labels, it could have met demand with a single Tamarack machine. However, because it also produced integrated cards, it needed more machinery to meet the total demand for its products. Additionally, USA would not have had a need for any of the three FME machines that it purchased if it did not produce integrated cards. Based on the presumption of prejudice and the evidence that USA offered relating to its capital expenditures for integrated cards products, USA has demonstrated that it changed its economic position and spent money that it would not have spent if Integrated Cards brought suit earlier. Therefore, the defense of laches applies and bars any damages arising before the commencement of this lawsuit on April 12, 2006.

III.     Equitable Estoppel

Because equitable estoppel imposes more drastic consequences than laches by barring a plaintiff from recovery damages at all, it requires proof of injurious conduct by the patentee. *See Naxon Telesign Corp. v. Bunker Ramo Corp.*, 686 F.2d 1258, 1264 (7th Cir. 1982). Equitable estoppel bars a patent infringement claim when the alleged infringer shows that: 1) the patentee led the alleged infringer to reasonably infer that the patentee would not enforce its patent; 2) the alleged infringer relied on that conduct; and 3) the patentee suffered material injury as a consequence of that

reliance. *See Aukerman*, 960 F.2d 1020, 1028 (Fed. Cir. 1992). Reliance and prejudice are required to estop the patentee from later suing. *See id.* at 1042-43.

For equitable estoppel to apply, the patentee's conduct must lead the alleged infringer to infer that the patentee does not intend to file an infringement claim, typically by correspondence or actions that communicate "something in a misleading way." *See id*; *Strickle v. Heublein, Inc.*, 716 F.2d 1550, 1559 (Fed. Cir. 1983). In the most common scenario, this misleading communication occurs when the patentee objects to the infringement but expresses some intention to not enforce its rights through litigation. *See Aukerman*, 960 F.2d at 1042. While silence alone is not enough to give rise to equitable estoppel, misleading inaction may give rise to estoppel when the patentee couples the inaction with other factors that induce the alleged infringer to believe that the patentee has abandoned its claims. *See id.* In determining whether a patentee's inaction led to a reasonable inference that the patentee has abandoned his claims, courts have required that communications between the parties "either somehow encourage the challenged activity or indicat[e] an intent to enforce patent rights followed by inaction. *See R2 Med. Sys. v. Katecho*, 931 F. Supp. 1397, 1416 (N.D. Ill. 1996); *ABB Robotics v. GMFanuc Robotics Corp.*, 828 F. Supp. 1386, 1397 (E.D. Wis. 1993).

For example, the patentee's silence after it threatened to bring an infringement lawsuit and held regular communications with the alleged infringer about developments in parallel litigation regarding the same patent estopped the plaintiff from bringing an infringement action. *See Scholle Corp. v. Blackhawk Modeling Co., Inc.*, 133 F.3d 1469, 1473 (Fed. Cir. 1998). However, when a patentee does not first threaten litigation, courts typically hesitate to estop the patentee's suit. *See Aukerman*, 960 F.2d at 1043-44 (finding estoppel did not apply when nine years of inaction passed

13

after patentee demanded that alleged infringer purchase a license to use the patent); *see also Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1294 (Fed. Cir. 1992) (holding estoppel did not apply when a period of inaction followed after patentee sent the alleged infringer an offer to purchase a license).

Here, the record is devoid of any evidence that John or Integrated Cards took any action that could have misled USA into believing that it would not enforce its patent. Although John knew that USA manufactured integrated cards as early as 1995, neither John nor Integrated Cards communicated with Steve or USA regarding the alleged infringement. In fact, there had been no communication at all between John and Steve since the brothers stopped working together in 1987, let a communication or action that would reasonably transmit a reluctance to enforce patent rights. While USA manufactured integrated cards for over ten years, Integrated Cards stood by silently, never threatening to bring suit for infringement of the '488 patent or even demanding that USA purchase a license for the patent like the plaintiffs in *Aukerman* and *Hemstreet*. Equitable estoppel requires more. It requires that the plaintiff take some misleading action beyond mere silence. Integrated Cards did not affirmatively encourage USA to produce infringing cards and it did not threaten to bring an infringement action before it sat by silently. Accordingly, it did not engage in the type of conduct that could have reasonably caused USA to believe that Integrated Cards would not enforce its rights in the '488 patent.

## CONCLUSION AND ORDER

For the reasons stated, equitable estoppel does not bar Integrated Cards' claims for infringement of the '488 patent. However, because Integrated Cards had knowledge of USA's

potential infringement and unreasonably delayed bringing the suit, the doctrine of laches bars any claim for damage that occurred before Integrated Cards brought suit on April 12, 2006.

                                                                  _____
Virginia M. Kendall
United States District Judge
Northern District of Illinois

Date: November 19. 2009